---

## In re SPENCER'S ESTATE.

### (Surrogate's Court, Madison County. January 25, 1889.)

DESCENT AND DISTRIBUTION—INHERITANCE AND LEGACY TAX—ADOPTED CHILD.

Testatrix, a maiden lady of advanced years, bequeathed the most of her estate to M., her niece. During her childhood M. had spent some time with testatrix, and at the death of the latter's only sister, with her father's consent, and at testatrix's request, M., then 22 years old, went to live with her, and was a member of her family continuously for 28 years, when testatrix died. M. always addressed testatrix as "Auntie," and neither ever stated that parental relations existed between them, though their conduct was that of parent and child. No payment by testatrix to M. for her services seemed to have been contemplated by either. During her residence with testatrix, M. married, and with her husband continued to live with testatrix, who supported the household. Laws N. Y. 1885, c. 483, as amended, impose a tax on legacies to certain collateral kindred, unless the legatee is a person to whom testator had for 10 years before his death stood in the mutually acknowledged relation of a parent. Held, that M. was such a person, and that her legacy was not liable to the tax.

*Charles Stebbins*, for petitioner. *E. N. Wilson*, Dist. Atty., for the People.

KENNEDY, S. Elizabeth Spencer, the testatrix, died at the village of Cazenovia, in this county, on the 4th day of March, 1888, leaving a will, in and by which she gave to four grand nephews and nieces $1,000 each, and bequeathed the remainder of her property, amounting to $15,000, to the petitioner, Mary Y. Jackson, and also appointed her executrix, and John D. Ely, of Rome, executor of her estate. The testatrix was a maiden lady, and Mrs. Jackson was her niece. It is claimed that the property devised to Mrs. Jackson is not subject to the tax mentioned in chapter 713 of the Laws of 1887, by reason of circumstances to which we shall hereafter refer, because she is a "person to whom the deceased, for not less than ten years prior to her death, stood in the mutually acknowledged relation of a parent." The evidence shows that Mrs. Jackson was a daughter of Archelaus Spencer, a brother of deceased, who resided at Rome, N. Y., from 1840 until his death in 1884. The testatrix and her maiden sister were residents of Cazenovia, and Mrs. Jackson, at the age of 15 years, went to school at this place for three years, living with her two aunts, after which she returned to her father's home, and there remained a period of nearly four years, when, upon the death of her Aunt Sarah, in 1860, and at the request of the testatrix, she returned to Cazenovia to live with her aunt, and continued to live with her until her death, in 1888, a period of nearly 28 years. The petitioner was not adopted by the testatrix by any legal formalities, but she has rendered those services, bestowed that care and attention, which would be expected from a daughter. All her relations have been those of a child instead of a domestic, heeding and respecting her aunt's desires, confiding in her judgment, shaping her life and char-

acter under her control and influence, doing all that a child could or would have done for the comfort and happiness of the testatrix; and, upon the other hand, the testatrix treated the petitioner and lived with her upon the same terms and in the same manner as a mother would be expected to live with a daughter, caring and providing for her in every respect as if she were an actual parent. In 1879 the petitioner was married to Mr. Jackson, but at the testatrix's request she and her husband continued to live with her until her death; she, in the mean time, having almost wholly supported them all. The testatrix was 58 years of age when Mrs. Jackson went to live with and make her home with her, her father consenting and approving such a course on her part, and bequeathing to Mrs. Jackson his interest, about $1,000, in the house which she occupied in Cazenovia. During all the time the petitioner and the testatrix lived together the words "mother" and "daughter" were not used in addressing each other, but both at home and abroad the testatrix was addressed as "Auntie," and Mrs. Jackson as "Mary," nor did either make statements or declarations to any person that parental relations existed between them.

By chapter 483 of the Laws of 1885 and amendments thereto, all property which shall pass by will or the intestate laws of this state to any other, with few exceptions, "than to the use of his or her father, mother, husband, wife, child, brother, sister, the wife or widow of a son, or the husband of a daughter, or any child or children adopted as such, in conformity with the laws of the state of New York, or any person to whom the deceased for not less than ten years prior to his or her death stood in the mutually acknowledged relation of a parent," is required to pay a tax of 5 per cent. upon the amount so devised or distributed; and our conclusion from the facts above and hereinafter stated is that the legacy to Mrs. Jackson comes within the exemption of the law, because of the fact that the testatrix stood in the mutually acknowledged relation of a parent for more than 10 years prior to her death; and our reasons for so holding are as follows: The father of Mrs. Jackson was a resident of Rome from the year 1840, having three children,—two sons and a daughter,—a man of ample means with which to maintain and educate his children, and provide a suitable home for them. Under such circumstances, it would be very unreasonable to assume he would have consented that his daughter should go to Cazenovia to live with and make her future home with his sister, if it had been understood by him that she was to remain there as a domestic, and be recognized as such by her aunt, and by the community in which she lived; but knowing the circumstances of his sister, the loneliness of her life, her dependent condition, the necessity for social surroundings acceptable to her, the incompleteness of her home without the freedom and joyousness which the life of one who might stand in the relation of a child to her might bring, it would be very reasonable to believe that he might, under such circumstances, be willing to make the sacrifice of his daughter's society, in order to make cheerful the home of his sister,—might be content to let the daughter go from the sheltering judgment of a father to the equally safe and watchful protection of a sister, knowing that in all the relations of life she would surround her with a mother's influence, and safely guide and guard her in all the paths of life. If the daughter was to sustain towards her aunt simply the relation of niece, if her life and conduct were not to be subservient to the wishes of her aunt, if she was to maintain independent relations, be free from the controlling motive which should exist in every home, be merely a nurse or companion instead of one discharging the duties of a child, it seems improbable that her father would have let his daughter leave him for such a purpose, would have consented to her exchanging her standing as a daughter for that of a watchful nurse of his sister, and so be known as a menial, rather than an equal, in the home of her aunt. The word "home" implies the existence of parental relations, and we cannot doubt he understood

that, in this exchange of homes, parental relations were to exist between them; that parental anxiety, vigilance, and solicitude would thereafter be the duty of the aged sister while she lived. Less than this understanding on his part would imply a lack of parental interest in his child, and we shall assume he would not knowingly and willingly have permitted his daughter to occupy a less honorable position in the home of his sister than she did in his own household. True, Mrs. Jackson at that time had a legal right to choose a home for herself, but, judging from all the circumstances attending her life, we think she did not leave her father's home to live with her aunt without his approval, and therefore infer that her relations with her aunt would be those which would be most likely to bring into existence that social element, and those friendly relations, surroundings, and influences, which parental associations alone can develop, and which do not arise, save where the mutually acknowledged relations of a parent are to exist and be a part of the home life of the parties interested.

The testatrix and her sister had lived in the same house together for many years at Cazenovia, and she had therefore been accustomed to other society and companionship than that of servants, and so, upon the death of her sister, in 1860, it would seem to have been a very natural course for her either to formally adopt some young girl, request some near relative or friend to come and live with her for a compensation to be agreed upon, or else to do as she did,—invite some niece to come and remain with her during her life. She had arrived at that age (58 years) when the oversight and education of a minor child would not be agreeable to her, and would be without any corresponding benefit. If she selected some one to be a nurse or associate for hire, there would be an absence of those fireside intimacies, that home fellowship and sentiment, so necessary and desirable on her part, so that her only recourse would be to choose some favorite relative of such age and understanding that she could rely upon her judgment in the management of her house and her business affairs, and in whose fidelity she could repose with the confidence of a mother in a faithful child,—some one who would bring to her house the associations of a youthful life, keep alive her attachment for society, her identity with the world about her, and thus enable her to continue that home life to which she had been accustomed while her sister lived. She knew the age of her niece, and she also knew something of the hopes and aspirations that come to a woman of her age, and the experiences of her own life, and its recollections must have made known to her that her niece would not lightly sacrifice her social standing by becoming a mere assistant to her aunt, for such compensation as her services might be worth, and that she would not occupy a position in her home which would be recognized by her acquaintances, and all with whom she might come in contact, as that of a servant. But, if these thoughts did not enter her mind at the time she invited her niece to live with her, her subsequent manner of life shows that the relation of a parent existed from the time Mrs. Jackson came to live with her until the death of the testatrix in 1888, because she maintained from the beginning of these relations to the end of her life that position which a parent ordinarily occupies. She controlled with firmness and decision all her household and business affairs, and her niece conformed and adapted her life to the views and desires of the testatrix; the aunt, until the marriage of Mrs. Jackson, providing everything for the house, and after that time substantially supporting the entire household, providing for her niece as a parent would for a child, and doing so apparently from the same motive that would influence a parent, and in the end doing what a parent ordinarily does to an only child,—bequeathed Mrs. Jackson all her property, with the exception of a few small legacies to other relatives.

All the evidence in this case, and all the suggestions which arise from the evidence, point to the conclusion that all the relations of the parties were pa-

rental in their intent and character,—parental in their design, execution, and results; for the relation of an actual parent, aside from the fact of birth, could not be established by stronger or more conclusive evidence than exists in this case, if one's life, acts, and conduct are of themselves evidence by which parental relations may be established and acknowledged. At the time Mrs. Jackson went to live with her aunt she had arrived at that age when she would be presumed to act with judgment and discretion, would be supposed to consult her own interests while gratifying the feelings of her father and her aunt; old enough to appreciate the intents and purposes with which she was invited to change the home of her childhood for a home with the testatrix; entirely capable of understanding what her future relations were expected to be in that home; must have been aware that she was not to be thereafter but an ordinary companion or housemaid to another; and that, if she went to live with her aunt for any other purpose, or stood in any other relation than that of an adopted child, she would be tolerated and recognized only as a servant by her friends and neighbors in Cazenovia; and we may therefore assume, from the facts which surrounded the origin of her changed life and situation, that it was her purpose to fill the place of a daughter, and not a servant; to discharge her obligation in such manner that her aunt would perceive in her obedience and faithfulness the interest of a child; would find in her life those sources of happiness which are so welcome to the solitude of age; and feel that she was a living in the atmosphere of a home, which only the life of a child can create; that in all her hopes and doubts, her joys or griefs, she could lean upon the trusty arms of one who was not a stranger to her thoughts and her heart; in all things so to live that there should be oneness of spirit between them; to live such a life that in the judgment and affection of her aunt as well as in the judgment of the community, and of all who knew their relations, there should be no question but that the duties and obligations of a child had been faithfully rendered to the testatrix from the time she crossed the threshold of her home until she was borne away to her grave.

That Mrs. Jackson supposed she was to assume, and did assume, the relation of an adopted daughter, is evident from the fact that at no time had there been any suggestion or agreement in reference to payment for her services; nor is there evidence that she ever received any pay for them, but during all the time she remained with the testatrix she was supported, provided for, treated as a child would be treated by a parent,—the aunt receiving the benefit of her companionship and her labors,—with the undoubted expectation on her part that she had ample means with which to place Mrs. Jackson in an independent financial position, and thus they lived for 24 years before provision was made by will to secure to Mrs. Jackson the heritage she had fairly earned, and to which her aunt believed her justly entitled. Had it not been understood by both parties that the relation of parent and child existed between them, it is not probable that Mrs. Jackson would have permitted so many years to pass away without payment or security for her services. There would have been accounts of payment kept by each,—something to indicate that their relations were of a business, and not a charitable, character. But if we assume that both understood from their mode of life that the relation of parent and child existed between them, then the conduct of each is natural and rational from the beginning to the end, and points to but one conclusion.

The suggestion is made that during all the time Mrs. Jackson lived with the testatrix she always called her "auntie," never "mother," nor was Mrs. Jackson ever spoken of by her aunt as her daughter; and hence the inference is sought to be drawn that, as between themselves, they did not recognize the parental relation. But when we take into consideration that the testatrix had never been married, that no grave held the dust of some child of hers, whose name and memory the word "mother" would keep forever fresh and green in her thoughts, it may be that the name of "auntie" bore to her ears

the significance and the evidence of a relation just as sweet and tender as that of "mother;" brought with it the recollection of desires and anticipations unfulfilled in her own life, which had become interwoven with the life of her niece, as she grew from childhood to womanhood, and became one of her own household; and so perhaps was satisfied, possibly preferred, that the names by which each had known the other, and by which each had grown into the other's affection, should be continued to the end; that the roots of their intimacy and friendship had so mingled and intercrossed that neither desired to graft the name of "Mother" upon the memories of the past.    But there may have been other than sentimental reasons for this custom of the parties, and their habit in this respect may be readily explained by the fact that Mrs. Jackson, from 15 to 18 years of age, had attended school at Cazenovia, and thus became known to the people of that place; had many intimate acquaintances and associates there, who were also well acquainted with her aunt; so that when she, at the age of 22, went to make her home with the testatrix, it would have been very embarrassing for her, and required constant explanation upon her part, to satisfy the curiosity of every one to know why this old aunt should be known as her mother.    There was no necessity at that time for any public declaration or explanation of their new relations, and we have no doubt that the social convenience of each was promoted, both at home and abroad, by addressing each other as they did.    Considering the age, relations, circumstances of all parties interested, it was not only good taste, but a very appropriate manner, to address her as "aunt," especially as she had never been a mother, and, so far as our observation goes, Mrs. Jackson followed the common usages of society in this respect.    As we have studied this case, and brought to mind the relations we have known to exist under somewhat similar circumstances, we do not doubt but that the name of "auntie" was as much a word of endearment and affection as the name of "mother," and that the use of the words "mother" and "daughter," as an acknowledgment of parental relations, was not necessary as evidence of the fact so long as both parties chose to recognize that relation by other names mutually satisfactory to both.

There are three ways, outside of the marital relations, by which, for the purpose of this statute, the parental relations may be established:    *First*.  By adoption, under chapter 830 of the Laws of 1873, and the amendments thereto, whereby an adult person takes a minor into the relation of a child, and thereby acquires the rights and incurs the responsibilities of a parent in respect to such minor.    Under this law, the child assumes the name of the person adopting it, and becomes his or her legal heir.    *Second*.  Where the adult by his conduct and relations to a minor stands *in loco parentis* to him, and thereby has become entitled to the rights and subject to the liabilities of an actual parent.  In each of these two cases, as well as in the case of an actual parent, it is their duty to maintain, educate, and protect the child during its minority.    *Third*.  Where a person of the age of 21 years and upwards, by agreement or at the request of an adult, becomes a member of his family, with the purpose of having the relation of parent and child exist between them.    This generally occurs where wealthy but childless people desire some one to bear their names and be the heir to their property; all parties living and conducting themselves in the same manner as if the relations were those of actual parents and children.    To accomplish this, sometimes names have been changed by act of the legislature, and sometimes by order of the court, and sometimes, as in this case,—where no change of name was necessary,—the parties commence their relations without legal ceremony.  In various ways, and under ordinary or peculiar circumstances, the parental relation between adults may come into existence and continue through life.    We suppose it was because the legislature was aware that it would sometimes be difficult, if not impossible, to prove the origin of such relations, the peculiar circumstances and necessities that made them desirable, the agreements, understandings, or arrangements that

were entered into,—all of the facts necessary to establish the legal existence of parental relations from their inception,—that it made the right of exemption from tax dependent upon the ability of the party claiming it to prove the fact that the deceased, for not less than 10 years prior to his or her death, stood in the mutually acknowledged relation of parent. From the fact that the law does not require the relation to commence during the minority of the child, it is evident it was intended to include all cases where that relation has existed for 10 years prior to death, without reference to the period of life at which the acknowledged relation of parent commenced; and hence we regard it as unimportant that Mrs. Jackson commenced to live with her aunt at the age of 22, instead of during her minority, in order to establish her right to exemption from the tax in question. Had she commenced to live with her aunt during her infancy, as an adopted child, and there remained until she was 21 years of age, the legal relation of parent and child would have existed as matter of law; and, had she then continued to live with the testatrix as she had done, it would have required affirmative evidence to overcome the legal presumption of the continuance of parental relations between them. Holding, as we do, that the relation of one who stands in the place of a parent may arise by virtue of an agreement between adults, or from circumstances surrounding the commencement and continuance of such relations, and that it was the intent of the law to give this class of cases the benefit of its exempting clause, the only remaining question for us to determine is whether there was a mutual acknowledgment of parental relations for a period of 10 years prior to the death of the testatrix.

In this class of cases, to "acknowledge" means to admit or recognize the existence of parental relations, and the question arises whether this must be done by agreements in writing, or by verbal declarations and statements in public, or to each other, or in some special manner, or whether the life, acts, and conduct of the parties may not of themselves be satisfactory and legal evidence of that acknowledgment which the law requires. We shall hold that it may be established by either or any mode of proof which will satisfy the court. The law in question does not suggest the character of the proof necessary to be supplied, it does not require the acknowledgment to be in writing, or by declarations in public, or to any person or persons; so that if the evidence conclusively shows that the parties understood that their relations were parental, and they thus lived together in this belief, discharging their duties and obligations to each other upon the theory that such relations existed, such manner of life is a mutual acknowledgment of the relations which each sustains to the other. The intent with which an act is done may be inferred from the act itself, and from its results; and no reason occurs to us why the intentions of the testatrix and Mrs. Jackson, in making arrangements to live with each other, may not legally and properly be inferred, not only from the circumstances attending the origin of their relation, but from their subsequent mode of living; and we think their lives, acts, and conduct, for a period of 28 years, the highest and most satisfactory evidence that could be given of their parental relations, not only as between themselves, but the public as well,—that their lives, acts, and conduct were and are, of themselves, a legal acknowledgment of parental relations. Believing, therefore, that the petitioner is a person to whom the testatrix, for not less than 10 years prior to her death, stood in the mutually acknowledged relation of a parent, within the meaning and intent of the act under consideration, an order may be entered accordingly.