30 N.J. Super. 479 (1954)
105 A.2d 28
IN THE MATTER OF THE ESTATE OF HENRY WELSH ROGERS, DECEASED.
MORRISTOWN TRUST COMPANY AND ARCHIBALD S. ALEXANDER, AS SUBSTITUTED ADMINISTRATORS, ETC., AND JOSEPHINE CHESNEY McCANN, APPELLANTS,
v.
AARON K. NEELD, DEPUTY DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 26, 1954.
Decided May 13, 1954.
*481 Before Judges EASTWOOD, JAYNE and SMALLEY.
Mr. George S. Fischler argued the cause for appellants Morristown Trust Company, etc.
Mr. Israel B. Greene argued the cause for appellant Josephine Chesney McCann (Messrs. Greene & Hellring, attorneys; Mr. Bernard Hellring, of counsel).
Mr. William A. Moore, Deputy Attorney-General, argued the cause for respondent (Mr. Grover C. Richman, Jr., Attorney-General of New Jersey).
The opinion of the court was delivered by JAYNE, J.A.D.
It sometimes seems almost lamentable that the clandestine moral laxities of a popularly respected man are not permanently interred with his bones. But money talks. It can destroy the vows of secrecy and demolish trust and gratitude. It is the cause of many astonishing somersaults. However, judges are not expected to be pulpiteers, and it is law in relation to facts rather than sentimentality that must guide the administration of justice in our courts.
One Henry Welsh Rogers died testate at the age of 75 on January 22, 1951, leaving an estate in excess of $1,000,000. *482 His last will, dated July 18, 1950, designated Josephine Chesney Sorensen (now Mrs. Virgil McCann) the life beneficiary of the substantial residue of his estate. Previous litigation concerning the estate may be found reported in 15 N.J. Super. 189 (Cty. Ct. 1951) and in 13 N.J. 508 (1953).
In the determination by the bureau of the Division of Taxation of the amount of transfer inheritance tax properly to be assessed upon the taxable interests transmitted by the decedent to Mrs. McCann, whom we shall for convenience and clarity hereafter distinguish as Josephine, the representatives of the decedent's estate advocated that Josephine should be recognized either as the illegitimate child of the decedent comprehended by L. 1934, c. 244, p. 704; R.S. 54:34-2; vide, Rogers, Trans. Inh. Tax, p. 148, § 366, or as a child to whom the decedent stood for the requisite period in the mutually acknowledged relation of a parent within the import of R.S. 54:34-2.1, and that the transfer should be assessed with the same exemption and at the same rate as a like transfer to a child of a decedent born in lawful wedlock.
Thus occasioned, an inquiry was conducted by an investigator of the division at which witnesses were orally interrogated and exhibits submitted. Upon a study of the record so comprised and evidently of some additional items of relevant information already in the files of the division, the supervisor resolved that the essential factual basis of the claim of the representatives of the estate had not been adequately established. The tax assessment was made accordingly. It is from that determination that the representatives of the estate and Josephine, the life tenant, prosecute the present appeal.
Rather than expel the scent of gold from her nostrils and forego a claim for this relatively inconsequential monetary advantage, leaving the memories of her deceased mother and of her affectionate and generous benefactor unsullied, Josephine preferred the endeavor to establish that her mother, Mrs. Chesney, had been an adulteress, the husband, Mr. Chesney, a cuckold, and the decedent a seducer.
*483 In acquainting ourselves with the information divulged to sustain the claim for the tax reduction we have recognized that a strict obedience to the rules of evidence would exclude much of it.
It is conceded that Josephine is the daughter of Adeline Schultz Chesney, who at the time of Josephine's birth on June 7, 1911 was the lawful wife of Martin Chesney. Josephine alone states that her mother and Mr. Chesney had been separated for several years before her birth. To suppose that Josephine possessed any prenatal knowledge of such a detachment of her mother and her husband is purely illusory. It is also evident that at the time of Josephine's conception and birth the decedent was likewise married. Perhaps significantly the marriages of both were dissolved by divorce in 1918.
The information imparted solely by Josephine generates the rational inference that from the inception of her capacity to remember, her mother and the decedent were playmates, yea, bedmates on the periodical occasions of the decedent's visits to her mother's home. As president of the International Red Cross the decedent was a traveler over wide stretches of the globe. The decedent probably maintained Mrs. Chesney and Josephine. Incidentally, it leaked out at the hearing that Josephine had engaged in a rash and adventurous marriage at the age of 16, the annulment of which the decedent financed.
Upon Mrs. Chesney's death on May 1, 1929 the decedent was duly appointed the guardian of Josephine. She was then 18 years of age and she thereupon became an associate member of the decedent's quarters, residing with him about six months of the year and at a girls' club in New York at his expense the remaining portion of the year during which the decedent traveled. Many times Josephine accompanied him.
In 1934 Josephine married Paul Sorensen. In 1938 the decedent relinquished his service for the Red Cross and Josephine and her husband came to reside with him. Josephine's second marriage seems also to have been dissolved, *484 and she thereafter continued to remain with the decedent at his residences until his death. Her marriage to Mr. McCann occurred thereafter on June 20, 1952.
Josephine avows that at an early age she derived knowledge of her alleged paternity from both her mother and the decedent but that she was emphatically instructed by both never to reveal the enlightenment. She explains that in obedience to the directions of her mother she addressed the decedent during her youth as "uncle." Later, however, at her maturity she called him "Chiefy" and accompanied him on his journeys. The latter practice the decedent's estranged brother regarded as somewhat unbecoming.
There were three witnesses before the investigator who stated that the decedent on a stated occasion had confided to them respectively the secret that Josephine was his daughter. To another witness the decedent is said to have remarked: "I don't have to adopt Josephine. She is mine."
The inquisitive would naturally wonder what information the official records reveal. The birth certificate represents Josephine to be the daughter of Martin and Adeline Chesnuik. The misspelling of the surname is explained to be attributable to the illiteracy of the midwife. In her first matrimonial endeavor in 1927 Josephine supplied the name of Martin Chesney as that of her father. The certificate of Josephine's marriage to Sorensen in 1934 also represents the name of her father as Martin Chesney. Indeed, in the certificate of her marriage to McCann on June 20, 1952 Martin Chesney is again designated as the bride's father.
Then we observe that in his previous wills of 1942 and 1944 the decedent referred to Josephine as "my former ward." In a proceeding in the Atlantic County Orphans' Court in 1943 relating to the distribution of the estate of his mother, this decedent declared that he had no issue. The allegations of the decedent in the petition for guardianship addressed to the Surrogate's Court of King's County, New York, were presumably not examined in quest of additional representations made by the decedent.
*485 While we have undertaken here only to sketch the paramount elements of the information adduced concerning the paternity of Josephine, we have sufficiently exhibited its state of incertitude on that issue. Both good men and naughty men may be less so than suspected. To surmise or conjecture the illegitimacy of birth would offend the principles of our public policy and established law. The legitimacy of every child born in wedlock is now and has since the earliest times been bolstered by an exceedingly sturdy presumption.
The presumption was given expression by a maxim of the Roman law, and at one period in the early English law the presumption attained the practical quality of conclusiveness. Y.B. 32-33 Edw. I 60 (1304); 1 Bl. Comm. 458, 459; 7 Am. Jur. 636, § 14; 33 Harvard L. Rev. 306; 17 Modern L. Rev. 152. A survey of the present decisional law in this country exposes the influence of the decision in 1846 rendered by Lord Langdale in Hargrave v. Hargrave, 9 Beav. 552, 50 Eng. Repr. 457. The presumption is recognized in this State. Vreeland v. Vreeland, 78 N.J. Eq. 256, 261 (E. & A. 1911); Cortese v. Cortese, 10 N.J. Super. 152, 160 (App. Div. 1950). True, it is a rebuttable presumption. Wallace v. Wallace, 73 N.J. Eq. 403 (E. & A. 1907).
It is, however, judicious to be aware of the inherent quality of the proof required to defeat the presumption. Some of the descriptive adjectives conspicuously discoverable in the decisions are "strong," "clear," "convincing," "satisfactory," "irresistible," "irrefragable," "conclusive." Vide, Patterson v. Gaines, 6 How. 550, 12 L.Ed. 553 (U.S. 1848); Annotation 128 A.L.R. 713; 7 Am. Jur. 655 et seq. Noticeably our own courts have stated that in order to establish the illegitimacy of a child born in wedlock, the proof must be such that "there is no possible escape" from that conclusion. Wallace v. Wallace, supra; Egnozzi v. Egnozzi, 17 N.J. Super. 433, 437 (App. Div. 1952). A tendency toward a modification of the burden of the refutory proof to fit the, shall we say, idiosyncrasies of modern life is perceptible. Such is the life of the law.
*486 But it may be stated without hesitation that the presumption comparable in substance to the presumption of innocence cannot as a matter of law be demolished by proof of circumstances which create only doubt and suspicion. While the evidence in this proceeding inspires a flip of the imagination, we are in accord with the conclusion of the examiner of the division that the proof failed adequately to sustain the claim that Josephine is the illegitimate daughter of the decedent. Although in the light of the evidence we do not pretend to classify the thesis of the contention as an absurdity, nevertheless the tensions of grave doubt exist.
The adaptation and applicability of R.S. 54:34-2.1 to the characteristics of the alliance between the decedent and Josephine necessitate separate consideration regardless of her paternity. The pertinent paragraph of the statute may well be quoted:
"The transfer of property passing to any child to whom the decedent for not less than ten years prior to such transfer stood in the mutually acknowledged relation of a parent, provided such relationship began at or before the child's fifteenth birthday and was continuous for ten years thereafter, shall be taxed at the same rates and with the same exemptions as the transfer of property passing to a child of said decedent born in lawful wedlock."
The provisions of the statute are not confined in their application to illegitimate children of decedents. Roberts v. Comptroller of Treasury of New Jersey, 85 N.J. Eq. 133, 134 (Prerog. Ct. 1915); Matter of Beach's Estate, 154 N.Y. 242, 48 N.E. 516 (Ct. App. 1897). And so one would have anticipated that in the circumstances the claim for the coveted exemption would have been preferably imputed to the terms of this legislative enactment.
The uncontroverted evidence supports the logical inference that during a period of more than ten years prior to the taxable transfers the decedent occupied a paternal association with Josephine. In those associations he discharged all of the normal and characteristic obligations of a parent. Longer than a decade his residence was hers and he provided her with support and maintenance. He performed the fatherly *487 role in the ceremony of her marriage. The photographs are illustrative and corroborative. That both parties recognized the parental and filial attitudes is not open to much doubt. There were some discussions concerning the institution of proceedings to effectuate a legal adoption.
It is the adequacy of the proof of the other essential element prescribed by the statute that is principally in debate. Did "such relationship" begin "at or before the child's fifteenth birthday," and was it "continuous for ten years thereafter"?
While it is biologically impossible for a child to possess personal knowledge of her paternity, yet it is reasonable to believe that a normally intelligent girl would be cognizant of the singular characteristics and environment of her home life during some appreciable span of time before her fifteenth year of age. In its pertinency to this branch of the case, Josephine's testimony, unlike its questionable competency to the former issue, is not necessarily and manifestly hearsay. Assuredly her testimony cannot be whimsically swept out of this inquiry. The pivotal question would seem to be balanced upon the credibility to be ascribed to it. Although uncontradicted by any dissentient or materially divergent evidence, should her testimony be rejected as essentially incredible? To do so in the absence of some definitely influential reason, we think would be fickle.
She has testified that ever since the inception of her memory and until his death the decedent remained in loco parentis in his relationship to her. The photograph identified as exhibit A-6 merits some relevant significance. It is said to have been taken when Josephine was nine years of age. Her appearance therein would indicate her age to be less than 15. The circumstance that the decedent was affectionately clasping her hand or wrist does not escape notice.
Although we have resolved that the evidential information failed to sustain the claim that Josephine was the illegitimate daughter of the decedent, we are conscious of its weight in its contributing support of the claim made under the statute. In this particular the fact that the decedent in *488 addition to the inter vivos transfers made Josephine the principal beneficiary of his will counts heavily in its affiliation with the other circumstances.
Clearly the alleged illicit parentage, if true, was mutually concealed from the public, but the paternalistic relation appears to have been not only mutually acknowledged but subsequently exposed conspicuously and generally recognized. The statute does not require proof that the paternalistic relation was from its inception publicly exhibited and universally acknowledged by the members of the communities in which the parties resided. Suffice to establish that the relation was "mutually acknowledged," that is, "mutually recognized and pursued" by the parties themselves. In re Spencer's Estate, 1 Con. 208, 21 N.Y. St. Rep. 145, 4 N.Y.S. 395 (Surr. Ct. 1889).
Moreover, we are not confronted in this proceeding with the more acute problem such as whether the natural relation of a grandfather and a granddaughter or of an uncle and a niece was in fact transposed into one like that of parent and child. Vide, In re Deutsch's Estate, 95 N.Y.S. 65 (Sup. Ct. 1905); In re Davis' Estate, 184 N.Y. 299, 77 N.E. 259 (Ct. App. 1906). Cf. Roberts v. Comptroller of Treasury of New Jersey, supra.
We conclude that the evidence together with the inferences logically and circumstantially to be derived from it entitles the appellants to the exemptions and rates of taxation in accordance with the provisions of R.S. 54:34-2.1.
Mandate in conformity with the conclusions herein expressed.