(22 Misc. Rep. 180.)

In re BIRDSALL'S ESTATE.

(Surrogate's Court, Chautauqua County. December, 1897.)

1. TRANSFER TAX—PROPERTY SUBJECT—LEGACIES—AMOUNT.
    Although specific bequests are each for less than $10,000, yet, if the entire personal property bequeathed amounts to that sum, each legacy is taxable under Laws 1892, c. 399 (Taxable Transfer Act) § 2.

2. SAME—RELATION OF PARENT AND CHILD—EVIDENCE.
    From the death of their surviving parent, in 1882, M. and S., then aged 10 and 5 respectively, had lived with their aunt B., later appointed their guardian, with the exception of M.'s absence at boarding school from the age of 13 to 16, and S.'s absence at the same place from the age of 9 until

11. B. had the control, care, and bringing up of her nieces until M. was married, with B.'s approval, in 1890, and thereafter S. spent a portion of her time with B., and the remainder with M. During all this time their relations were friendly, and the girls called B. "auntie," and she called them "my dear girls," but they were not held out to the community as mother and children. As guardian, she allowed all her nieces' expenses, including board, clothing, education, wedding outfit of M., etc., to be paid from their estate, which was worth jointly $50,000, while she was worth nearly $280,-000, and she took her commission as guardian. *Held*, that the mutually acknowledged relation of parent and child did not exist under Laws 1892, c. 399 (Taxable Transfer Act) § 2, exempting real property, and taxing personal property at the rate of only 1 per cent., when the grantor or devisor and the grantee or devisee, for more than 10 years prior to the transfer, have stood in the mutually acknowledged relation of parent and child.

3. SAME—TRANSFERS IN CONTEMPLATION OF DEATH.

Evidence that one was 79 years old, afflicted with consumption, from which she knew she could not recover, and under the constant care of a physician, with knowledge that death was imminent, made a deed of gift of the bulk of her property to her nieces, 8 days before her death, although the same property had been devised to them by her will, executed but a few months previous, shows that such transfer was made in contemplation of death, within Laws 1892, c. 399 (Taxable Transfer Act) § 1.

4. SAME—GIFTS INTER VIVOS—CONSTRUCTION OF STATUTES.

Laws 1892, c. 399 (Taxable Transfer Act) § 1, provides that a tax shall be paid on property transferred by deed or gift in contemplation of death of the grantor or donor, or intended to take effect in possession or enjoyment, at or after such death, and that such tax shall also be imposed when any such person or corporation becomes beneficially entitled, in possession or expectancy, to any property or the income thereof, by any such transfer, whether made before or after the passage of the act. This law was an amendment to Laws 1887, c. 713, which provided for a tax on deeds, gifts, etc., to take effect at or after death, but did not in terms impose a tax upon grants or gifts made in contemplation of death, although gifts causa mortis were probably covered by it. *Held*, that the amendment applies to gifts inter vivos as well as to gifts causa mortis, where the beneficial interest under a deed is vested in the grantee after the passage of the act.

Proceedings to determine the amount of the transfer tax upon the real and personal property of Margaret I. Baldwin and Sarah J. Peacock, devised and deeded to them by Sarah J. Birdsall, deceased. Ordered that the entire property be taxed at the rate of 5 per cent.

Henry Chase, for executors and others.

Walter S. Jenkins, for county treasurer and another.

WOODBURY, S. Mrs. Birdsall executed her last will and testament on the 8th day of June, 1895. She died December 13, 1895, and her will was admitted to probate by a decree of this court on the 2d day of March, 1896. William G. Martin was appointed appraiser under the taxable transfer act, upon application of the executors, and on the 8th day of November, 1897, made and filed his report. On the same day the surrogate heard the arguments of counsel for the respective parties. After making bequests to the amount of $36,700, upon which all the tax to which the same is liable has been paid, the testatrix bequeathed and devised all the residue of her estate, both real and personal, to her two nieces, Margaret I. Baldwin and Sarah J. Peacock. The residue of the personal estate is conceded to be the sum of $5,802.56, and the real estate devised by said will is found by the appraiser to be of the value of $30,441.50. Eight days prior to her de-

cease, and on the 5th day of December, 1896, the testatrix deeded, as a gift, real property found by the appraiser to be of the value of $216,-550, to her said nieces, the residuary legatees under her will.

It is claimed by the residuary legatees and executors that the personal property passing to the residuary legatees, being less than $10,-000 in amount, is not taxable. It is conceded, however, that the aggregate amount of all the personal property passing to the legatees by virtue of the will largely exceeds the sum of $10,000; and, following In re Hoffman's Estate, 143 N. Y. 327, 38 N. E. 311, which must be regarded as controlling in this matter, it must be held that the same is taxable, although the value of the individual legacies is less than $10,000. The rate of taxation depends upon the relation existing between the testatrix and the residuary legatees, and the determination of the nature of that relationship is one of the main contentions in this case.

The executors and residuary legatees contend (1) that the testatrix, for not less than ten years prior to the transfer of said property, stood in the mutually acknowledged relation of a parent to the said residuary legatees, and consequently that all the real property transferred to them is exempt from any payment of any tax, and that whatever of any personal property there may be subject to taxation is only taxable at the rate of 1 per cent.; (2) that the real property conveyed by deeds of gift by the testatrix to the residuary legatees prior to her decease was not made in contemplation of death, as that term is employed in subdivision 3 of section 1 of the taxable transfer act, and that in consequence thereof the same is not subject to the payment of any tax.

Now, if it shall be found that the testatrix, for not less than 10 years prior to the transfer of said property, stood in the mutually acknowledged relation of a parent to the residuary legatees, then none of the real property which was transferred by the will or by the deeds of gift, prior to her decease, is subject to taxation, and the personal property passing by them by virtue of the term of the will is only to be taxed at the rate of 1 per cent. If, however, it shall be found that this relation did not exist between the testatrix and the residuary legatees, then the personal and real property passing to them by her will is all taxable at the rate of 5 per cent.; and the real property transferred by the deeds of gift prior to her decease will be taxable at the rate of 5 per cent., provided it shall be found that the same was deeded in contemplation of death, as that term was employed in the statute to which we have referred. Thus, it will be seen that if this relation did exist, and had existed for the statutory period of 10 years, it disposes of the question in this case. It determines that none of the real property transferred by the will, or by the deeds of gift, is subject to taxation, and also fixes the rate at which the personal property, or rather the transfer thereof, is taxable. We will therefore undertake to dispose of the question of the relationship first.

The father of the legatees died April 8, 1880, and the mother died on the 24th day of June, 1882. At the time of the death of their mother, Margaret was 10 and Sarah 5 years old. The testatrix, Sarah J. Birdsall, was the paternal aunt. She was a widow, 64 years of

age at the death of Mrs. Peacock, and has never had any children of her own. About three weeks prior to her death, Mrs. Peacock and these two girls were sick with the measles at their home, in Mayville, N. Y.; and the testatrix went there, and cared for them until the death of Mrs. Peacock, and, after her death, continued to stay there and care for these girls until they were taken to Sherman, N. Y., by one Betsey Harmon, their grandaunt, a few days after the death of their mother. It appears that, immediately after the death of Mrs. Peacock, a controversy arose as to the custody of these girls. Betsey Harmon, their grandaunt, was appointed guardian of their person by Surrogate Maples, of Chautauqua county, and, as we have already stated, took them to her home, at Sherman, N. Y. Then Mrs. Birdsall, being unwilling that Mrs. Harmon should have the custody of these girls, instituted a proceeding in the supreme court for the appointment of another guardian for them; and, in that proceeding, C. P. Skinner, of Westfield, was appointed their general guardian. The order of the court provided, however, that the guardian should permit the relatives of said infants, paternal and maternal, to visit them at all proper times. Immediately upon the appointment of Mr. Skinner as guardian, he obtained possession of these girls from Mrs. Harmon, after they had been in her custody for about 10 weeks, and placed them in the custody of the testatrix, at Westfield, N. Y., where she then resided; and two days thereafter she removed with them to the Peacock homestead, at Mayville, N. Y., which was owned by said infants, and where they had formerly resided with their parents, and undertook their care and bringing up. It is a fair inference from the evidence that she entered into an agreement with the guardian that the estate of the infants should bear the burden of their maintenance, and that she was to receive a stipulated price for their board. Upon the other hand, she leased the homestead, and paid rent therefor, and continued so to do until the time of her death. In 1885 the testatrix was appointed, by the supreme court, guardian of their person and property, and continued to act in that capacity until shortly after the marriage of Margaret, the eldest of the girls, to Alvin T. Baldwin, when, by an order of the same court, made upon application of the testatrix, on the 23d day of April, 1891, she was discharged from her trust as such guardian, and Mr. Baldwin appointed in her place and stead.

From the time of her going to the Peacock homestead, in 1882, the testatrix had the control, care, and bringing up of these girls, who were nieces, until the marriage of Margaret, in 1890. She looked after them in every way, and superintended their education, both secular and religious. They looked to her for advice and counsel, and her wishes and judgment were deferred to and followed by them. During this period of time they all resided together as one family, except that Margaret spent three years, dating from the time she was thirteen years of age, and Sarah spent two years, dating from the time she was nine years of age, at a boarding school in the city of Buffalo, N. Y., where they were placed by the testatrix, presumably spending their vacation at Mayville, with the testatrix. The relationship between them was friendly and affectionate, as would appear

from the evidence.    The girls were wont to call the testatrix "auntie," and she would often address them as "my dear girls," "dear girls," and the like.    They were in the habit of assisting her by doing her errands, helping to care for and nurse her, and aiding her in dressing and undressing when needed.    Margaret was married with the approval of the testatrix, at the home thus established.    After her marriage, which occurred about eight years after she commenced to live with testatrix, she took up her residence with her husband at or near Rochester, N. Y., and never thereafter resided with testatrix.    Shortly after the marriage of Margaret, Sarah went to live with her, and continued to live with her until about two years before the death of the testatrix, when she came back to Mayville, and made it her home, as she had theretofore done, with her aunt, the testatrix, until the testatrix died, although spending a good deal of the time with her sister at Rochester, N. Y.    While living with her sister, Sarah was attending school, and her vacations, about two months during each summer, were spent with this aunt.

The testatrix rendered and settled her account as guardian, at the time of her discharge, covering the whole period of her guardianship, and her accounts are a part of the evidence before us in this proceeding.    An examination of these accounts discloses the fact that the burden of the maintenance, support, and education of these girls was borne by their estate, and that no part thereof was borne by the testatrix.    So far as the evidence discloses, these accounts were settled and allowed by the court.    The accounts were submitted in evidence as bearing upon the question of the relationship existing between testatrix and these nieces, the residuary legatees.    It appears from these accounts that the testatrix, in her capacity as guardian, charged against her said nieces all expenditures incurred in their behalf for clothing, sewing and mending, tuition, schoolbooks, board, pew rent in church, railroad fare, legal services for herself as guardian, etc.    She periodically charged and retained her commission upon all moneys received and expended by her as guardian, and regularly charged and retained for their board $7.50 per week for each of them while they were living with her.    When Margaret was married, her wedding outfit and the expenses of the wedding were paid for by the estate, and charged against her by the testatrix.    It also appears that, when the testatrix resigned her trust as guardian, Margaret was not residing with her; and the fair inference from the petition of the testatrix is that Sarah was not residing with her at that time, but she was residing at Rochester, with her sister; and from the petition of Mr. Baldwin, upon which he was appointed guardian for both of the girls, it appears by distinct and direct allegation that both of them then resided at Rochester, N. Y.

The foregoing are the main facts in this controversy, which we regard as established by the evidence taken by the appraiser; and we are called upon to determine whether they established the facts that the testatrix stood in the mutually acknowledged relation of parent to these nieces, her residuary legatees, for not less than 10 years prior to her decease, so as to exempt the transfer of the property to them from taxation, under section 2, c. 399, Laws 1892.    In

the disposition of this question, we have examined with considerable care the leading cases bearing upon this provision of the statute, among which are: In re Wheeler's Estate, 1 Misc. Rep. 450, 22 N. Y. Supp. 1075; In re Spencer's Estate (Surr.) 4 N. Y. Supp. 395; In re Nichols' Estate, 91 Hun, 134, 36 N. Y. Supp. 538; In re Stilwell's Estate (Surr.) 34 N. Y. Supp. 1123; In re Butler, 58 Hun, 400, 12 N. Y. Supp. 201; In re Moulton's Estate, 11 Misc. Rep. 694, 33 N. Y. Supp. 578; In re Sweetland's Estate (Surr.) 20 N. Y. Supp. 310. These cases may be regarded as settling the question of the meaning of the term "mutually acknowledged relation," as that term is employed in the statute, proceeding, as hey do, upon the same general principles of interpretation; but they also demonstrate the fact that the actual existence of such relationship must be ascertained and determined from the facts existing and the circumstances surrounding each particular case.

In Re Butler, 58 Hun, 400, 403, 12 N. Y. Supp. 201, 203, Dykman, J., says:

"The word 'mutual,' in this statute, has no abstruse signification. It means and requires reciprocity of action, correlation, and interdependence, and finds its best illustration and application in the relations existing between parents and children, which are always mutual."

In Re Nichols' Estate, 91 Hun, 134, 139, 36 N. Y. Supp. 538, 541, Mayham, P. J., says:

"It seems clear to us that the use of the general words [referring to the words 'mutually acknowledged relation'] was intended to embrace a class of persons who, while not in fact sustaining the blood relation of parent and child, had assumed and adopted that conventional relation, by mutually acknowledging it by their method of living, and mutual recognition of that relation for ten years."

The court in this case cites with approval In re Wheeler's Estate, supra, and also Case of Spencer (Surr.) 4 N. Y. Supp. 396. In the Spencer Case, Surrogate Kennedy, in the course of an elaborate and exhaustive opinion, says:

"In this class of cases, to 'acknowledge' means to admit or recognize the existence of parental relations; and the question arises whether this must be done by agreements in writing, or by verbal declarations and statements in public, or to each other or in some special manner, or whether the life, acts, and conduct of the parties may not of themselves be satisfactory and legal evidence of that acknowledgment which the law requires. We shall hold that it may be established by either or any mode of proof that may satisfy the court. The law in question does not suggest the character of the proof necessary to be supplied. It does not require the acknowledgment to be in writing, or by declarations in public, or to any person or persons; so that if the evidence conclusively shows that the parties understood that their relations were parallel, and they thus lived together in this belief, discharging their duties and obligations to each other upon the theory that such relations existed, such manner of life is a mutual acknowledgment of the relation which each sustains to the other."

The learned surrogate, in the same case, at page 400, points out how this parental relationship may be established, viz. by adoption under the statute, by agreement when the person who is to occupy the relation of child is 21 years, and, lastly, "where the adult, by his conduct and relations to a minor, stands in loco parentis to him, and thereby has become entitled to the rights and subject to the liabili-

ties of an actual parent. In each of these two cases [referring to adoption and the one now being referred to], as well as in the case of an actual parent, it is their duty to maintain, educate, and protect the child during its minority."

Counsel for the residuary legatees also suggest a standard by which this question is to be determined, which we think is in general accord with the decisions referred to. He says: "The real question is, did these two nieces stand in the same relation to the testatrix, Sarah J. Birdsall, that they would have stood in if the testatrix had been their own natural mother?" Viewed in the light of the interpretation placed upon the statute in question by the authorities referred to, and the standard by which we are requested to determine this question (in which, generally speaking, we concur), let us briefly refer to the evidence in this case which bears upon the facts,—the life, the conduct, the declaration, and the understanding of these parties, —for the purpose of determining whether or not it established that mutually acknowledged relation which the statute contemplates.

The testatrix, in her will, refers to these legatees as her nieces, and makes no mention of any relationship. They were in the habit of calling her "auntie," and there is no evidence that they ever spoke to or of her as their mother. As we already stated, she often addressed them as "dear," "my dear girls," "dear girls," etc.; and there is no evidence that she ever spoke to or of them as her daughters or children. There is nothing in the evidence to show that she ever held them out to the public as her children, or they her as a mother; and, so far as the evidence discloses, there is nothing to indicate that the reputation respecting the relationship which they bore to each other in the community was other than the legal one existing between them. The endearing terms in which the testatrix referred to these nieces is some evidence, standing alone, of the relationship contended for; but they are also consistent with the legal relations existing between them, and, taken in connection with all the other facts and circumstances in the case, are, we think, the more consistent with the latter relation. These declarations are not, however, controlling as to the relations existing between the parties, but are evidence of that relationship, to be considered in that connection with all the other evidence in the case. The acts, conduct, and every-day life and dealings of the parties have, in our opinion, greater weight in determining the relations which in fact existed between them than mere declarations and speech. The latter is easily perverted or misconstrued, while the acts, conduct, and dealing of the parties in every-day life point with almost unerring certainty to the true conditions and relation existing between them. We have reached the conclusion in this case that the testatrix did not stand in the mutually acknowledged relation of parent to these nieces, and shall therefore only refer to the evidence in detail sufficiently to state our reasons for so holding.

Let us bear in mind during the further discussion of this case that the testatrix possessed a very large fortune, the nature and extent of which, during the period in question, can readily be understood from the figures already given; that it must have yielded an income

largely in excess of her needs; that she had no family of her own upon which to spend it; and that these girls were her nearest blood relations, living with her under the circumstances already detailed. And let us also bear in mind that the aggregate estate of these girls was about $50,000, or less than one-fifth of that of the testatrix, as the evidence shows. By bearing these facts in mind, we can better understand the force of the evidence bearing upon the proposition under consideration.

The evidence of the nieces tends to show that the testatrix very frequently gave them spending money; that she always made her presents to them in that way; and that she kept no account of the moneys which she let them have; but they do not, as we now recall, give evidence of any knowledge that she furnished them with any spending money out of their own estates, and charged the same against them in her accounts as guardian. With one or two exceptions, the evidence fails to show when or under what circumstances or in what amount she let them have money. Her accounts as guardian disclose the fact that she frequently and quite regularly let them have spending money from their own estate, and charged the same against them, and her accounts bear evidence of the fact that these allowances were very liberal in amount. In view of these facts, we are not convinced that the moneys that the testatrix let these girls have were all monetary donations on her part, but, on the contrary, we are of the opinion that the greater part of the same, at least, were moneys belonging to their estate, which the testatrix was handling as their guardian. In view of these facts, we cannot regard such acts of the testatrix as parental.

The act of the testatrix in placing Sarah in a boarding school for a period of two years, commencing when she was of the tender age of but nine years, is, to say the least, an unusual act and an uncommon thing for a parent to do; and but very few parents would consent to do so, or to be parted from their child in that manner when the child was of such tender age, unless extraordinary or peculiar circumstances have been disclosed by the evidence in this case.

From the evidence of the nieces it would also appear that the testatrix received no compensation for her services in caring for and looking after them, at the same time conceding that they were supported, educated, and maintained out of their own property. It does appear, however, that the testatrix was reimbursed for all expenditures incurred by her as guardian; and that their clothing was paid for from their estate; and that she received and took her commission as guardian; and, also, that she retained and received $7.50 per week for the board of each of them during the period of time they were living with her. Can it therefore be said that she received no compensation for these services? Her commissions fully compensated her for looking after their property, and, considering the fact that they were residing in a rural community, $7.50 per week for the board of each of them was sufficient to reimburse her for the cost of their board, and leave a reasonable compensation for her services in caring for them. The price charged was largely in excess of what their board was worth or would cost in the community where they resided.

But let us look at these charges in another light. If the parental relation existed between these parties, what right had the testatrix to make any charges for the board of these nieces? It is the duty of parents to support and educate their child, and, as we have seen, where this assumed relation exists the same obligations follow. We are unable to see how the testatrix, if she stood in the mutually acknowledged relation of parent to these nieces, would have any right to charge them for their board, or for their care. If they were her own children, she would not be permitted to make these charges, and a court would not justify these expenditures. She had more property of her own than she could possibly use for her own benefit, and it seems incredible that she should charge these nieces for their care and board, and yet at the same time claim to stand in parental relation to them. These acts and this conduct on the part of the testatrix are not parental, and tend to dispel the presumption that parental relations existed between her and them.

Again, the act of the testatrix in charging to Margaret the expenses of her wedding and wedding outfit tends to dispel the presumption and claim of a parental relation. What mother, situated as the testatrix was financially, would permit her child to pay for her wedding outfit, and for the serving of her wedding breakfast or supper? What mother so situated would permit her child to leave the parental roof under such circumstances? We cannot bring ourselves to believe that the testatrix would have done this if she had assumed this parental relationship towards these girls, or any mother, real or assumed, similarly situated. Then, again, the presumption of parental relationship is dispelled by the acts of the testatrix in charging against these girls their schoolbooks and tuition, sewing and mending, clothing and shoes, pew rent in church, and many other items which are contained in her accounts as guardian. These acts are not only inconsistent with such relationship, but they are inconsistent with the legal obligations of a parent, or one who has assumed such relation, to support and educate their children.

It will serve no useful purpose to multiply illustrations of this kind which tend to characterize the nature of the relations existing between the testatrix and these residuary legatees. These acts of the testatrix are all consistent with her duties as guardian, and are inconsistent with parental relations. These residuary legatees were evidently favorites of the testatrix, and she doubtless intended that they should have the proper care and bringing up. The acts and conduct of the testatrix suggest the existence of a well-regulated guardianship, and nothing more. Our conclusions are, therefore, that the testatrix did not stand in the mutually acknowledged relation of a parent to these residuary legatees for the statutory period of 10 years prior to the transfer of the property in question. A tax of 5 per cent. will be imposed upon all the property, real and personal, transferred to the residuary legatees by the will of the testatrix.

This brings us to the consideration of the second question involved in this proceeding: Were the deeds of gift of the real property, valued at $216,550, executed and delivered by the testatrix to the residuary legatees eight days prior to her decease, made "in contem-

plation of death," as that term is employed in subdivision 3, § 1, of the taxable transfer act? The evidence in this case establishes to our entire satisfaction that the transfer of property was made in contemplation of death. It is true that, at the time the deeds were delivered, nothing was said by the testatrix with respect to her decease or the probability of life; but the circumstances lead us irresistibly to the conclusion that she was contemplating this event at the time of making said transfer, and that the same was made in view of that event. It appears that she was an old lady, past 79 years of age, and afflicted with consumption, from which she knew she could never recover. For several months prior to making these transfers, she had been under the constant and almost daily care of her physician, who had informed her that she could not be cured; that the only thing he could do for her was to make her feel better. Some days she coughed a great deal, and was made very weak thereby, and upon other days would feel much better. She was constitutionally weak, yet possessed of great vitality. She knew the fact that she was liable to be taken worse and die at any time, or, upon the contrary, that she might live for a considerable period of time. It was under these conditions that she contemplated making a transfer of property to her nieces. Her attorneys were instructed to make investigation and prepare and make necessary papers to that end. The property transferred constituted the large bulk of her property, considerably more than two-thirds of the amount thereof in value. Taking all these facts and circumstances into consideration, it seems to us that no other conclusion can be reached than that the testatrix, in making this transfer of property, was considering, thinking of, and contemplating the fact that she was approaching the end of her lease of life, and that her act in making such transfer was in contemplation of that event. It is urged by counsel for the residuary legatees that our conclusion in this respect is not warranted by the facts and circumstances disclosed, and this transfer was not made in contemplation of death. It is claimed that, if the testatrix had contemplated it, it would have been unnecessary to make, and she would not have made, the transfer, because of the fact that these residuary legatees, to whom the transfer was made, would have taken the same property under and by virtue of the terms of her will; and it is urged that the reason why the transfer was made was because she was desirous of having these nieces enjoy the income from a portion of her estate during her lifetime. It appears that the testatrix had frequent conversations with Margaret, for the period of about five years prior to her death, in regard to the contemplated conveyance of a gift of certain of her real property to them. From their testimony it would appear that she had very frequently told them that it was her intention and desire to convey to them a portion of the real property, so that they might have and enjoy the income thereof during her lifetime. Kate Sperry, the servant of the testatrix, testifies to conversations had with the testatrix in April and September before her death, in which she stated it was her intention to convey to these certain nieces certain of her real property, to the end that they might have and enjoy the income therefrom during her life, and the tes-

tatrix told her in these conversations that she wanted these nieces to have this property right away. In view of these facts, it is urged by counsel for the comptroller that if the testatrix was so anxious that these nieces should have the use and income of this property during her life, and that she wanted them to have it right away, and had frequently talked with them and her servant concerning it for the period of time disclosed by the evidence, she would have deeded the property to them at the time she required the attendance of her counsel for the purpose of preparing her will in June, before her decease, instead of giving it to them by that instrument. It is also urged that, if the testatrix desired these nieces to have a portion of her income, she would have given some portion thereof during her lifetime, but that, instead of so doing, she retained the same unto herself, and even collected the rent for the month of December, in which she made the transfer of the property in question on the 5th instant.

The fact that the testatrix deeded to her nieces the same property which was devised to them by her will, executed but a few months previous, standing alone and by itself, would be a strong indication that she did not contemplate death at the time of making the transfer, and was actuated in so doing by the thought of her approaching end; but when taken in connection with the other circumstances in the case, which we have already referred to, it seems to us that the force of that presumption is completely destroyed. It seems quite clear that she may have had other reasons for desiring to deed this property to her nieces, rather than have it pass by her will. She was acting under the advice of counsel, and it is quite possible that she may have contemplated the possibilities of a contest over the will after her decease, and desired to obviate it by a gift of the property in her lifetime, or it is possible that the question of transfer tax may have induced her action in that respect. But it is unnecessary to discuss these questions, as her motives for the act whether to avoid the tax, or to avoid litigation over her will, could make no difference as to the liability of this property to taxation.

The deeds of conveyance were without consideration, and constituted a gift of the property to these nieces. Possession was delivered, and they immediately assumed the control and management of the property. The gift was one in præsenti. It was a gift inter vivos, absolute, unreserved, and unconditional. It was not a gift causa mortis, because it was not intended to be conditional; and no right of revocation was reserved either expressly, by inference, or by implication. It passed to these nieces an absolute, irrevocable, and indefensible title.

The act (Laws 1892, c. 399, § 1) provides that a tax shall be paid:

"(1) When the transfer is by will or by the intestate laws of this state from any person dying seized or possessed of the property while a resident of the state. (2) When the transfer is made by will or intestate law of property within the state, and the decedent was a nonresident of the state at the time of his death. (3) When the transfer is of property made by a resident or by a nonresident, when such nonresident's property is within this state, by deed, grant, bargain, sale or gift made in contemplation of death of the grantor, vendor or donor, or intended to take effect, in possession or enjoyment, at or

.after such death. Such tax shall also be imposed when any such person or corporation becomes beneficially entitled, in possession or expectancy, to any property or the income thereof, by any such transfer, whether made before or after the passage of this act."

It is very evident that the word "deed," as used in this act, has no reference to conveyance of property by such an instrument made in the ordinary course of business for a valuable consideration, but is confined to conveyances of real property intended as gifts; and it is also quite evident that it was intended to eliminate any technical distinction between gifts of real property and personal property, and place both classes in the same category, so far as the taxation of the transfers thereof under this act are concerned. We shall therefore, in determining the question involved, treat the conveyance of this property, by deed, as a gift inter vivos, made in contemplation of death.

It is urged that this statute does not impose a tax upon the transfer of property by gifts inter vivos, but is confined in its operation, in imposing a tax upon transfers by gift, to gifts causa mortis. The language of subdivision 3, § 1, of the act in question, reads:

"When the transfer is of property * * * by deed * * * or gift made in contemplation of the death of the grantor, vendor or donor, or intended to take effect, in possession or enjoyment, at or after such death."

Thus far the language of the statute is plain and unambiguous. It is not in express terms limited in its operation or effect to any particular class of gifts, but is broad and unrestricted enough to cover alike grants or gifts inter vivos made in contemplation of death as well as gifts causa mortis. In both cases, however, the statute, as a condition of the right to tax, requires the concurring event that such gift should be made in contemplation of death.

The rule is well settled in the interpretation of statutes that the legislature is presumed to use apt words to express the meaning and intent of its enactments, and it is ordinarily the duty of the court, in construing a statute, to give the language employed its usual and ordinary meaning and force. In re Nichols' Estate, 91 Hun, 138, 36 N. Y. Supp. 538; Tompkins v. Hunter, 149 N. Y. 117, 122, 43 N. E. 532. We see nothing in the language employed in this act, thus far, which requires or justifies a court in limiting its operation to one particular class of gifts, to the exclusion of the other.

There is another salutary rule adopted by our courts, and universally recognized, in the interpretation of statutes, which is quoted by Peckham, J., in the case of People v. Butler, 147 N. Y. 167, 41 N. E. 417, viz.:

"The cardinal rule in the interpretation of statutes is to arrive at and give effect to the intention of the legislative body which enacted them."

In the same case, Peckham, J., in discussing and applying the rule, says:

"This intention is primarily to be deduced from the language used in the statute itself; and it has been said that, where said language is clear and unambiguous, there is no room for construction, and that effect must be given to its plain and obvious meaning. Language which, when separated from the rest of the act, is thus plain and unambiguous, may, when read in connection

with the whole act, be thereby rendered ambiguous, and the necessity for construction become for that reason quite apparent. Sometimes the language of some parts of a statute, when considered with reference to the ordinary meaning attributed to such language, is so clear and unambiguous that it would seem not to be open to any construction other than its plain, obvious meaning calls for; and yet, when read in connection with the whole act and in the light of what the real intention of the legislature must in the nature of things have been, the construction properly to be favored leads to a result which is different from what it otherwise would have been."

Before referring to other provisions of the statute under consideration which may be relied upon to give it a different interpretation than its plain language seems to indicate, under the rule advanced by Peckham, J., in the Butler Case, let us call attention to another salutary and well-settled rule,—that a law is never to be construed as having a retroactive effect unless its express letter or clearly manifested intention so requires; that, if the language of the law can be satisfied by giving it prospective operation, it should be construed as having a prospective operation only. In the light of these rules, let us refer to the language of the act immediately following that last quoted, upon which reliance must be placed to give it a different meaning than its plain language seems to indicate,—a meaning which will limit it to gifts causa mortis, and exclude from its operation gifts inter vivos made in contemplation of death. Such language is as follows:

"Such tax shall also be imposed when any such person or corporation becomes beneficially entitled, in possession or expectancy, to any property or the income thereof, by any such transfer, whether made before or after the passage of this act."

The question now recurs, does this language restrict the operation of the statute to a particular kind or class of gifts, namely, gifts causa mortis? If such is its effect, it is by reason of the fact that to give it a construction which will embrace all classes will make it retroactive in its operation and effect. That it applies to gifts causa mortis there can be no question. In re Seaman's Estate, 147 N. Y. 69, 41 N. E. 401; In re Green, 7 App. Div. 339, 40 N. Y. Supp. 1019; In re Crosby (Surr.) 20 N. Y. Supp. 62. In fact, under the statute of 1887 (chapter 713), and before the amendment thereto embracing transfers by deed, gift, etc., made in contemplation of death, incorporated in 1892, the language of the statute which provided for deeds, gifts, etc., intended to take effect at or after death, was probably broad enough to cover this class of gifts; for a gift causa mortis is made with respect to its effect after death, is conditional upon the happening of that event, and revocable during life, and may therefore be said to take effect at or after death. This interpretation was placed upon that language by the court in the case of In re Edwards, 85 Hun, 436, 32 N. Y. Supp. 901. If this interpretation of the statute as it then existed is correct, then the amendment of 1892, by adding the words "made in contemplation of death," etc., have no new office to perform, and are practically valueless, if limited in their application to gifts causa mortis. We do not believe that such was the intention of the legislature in incorporating this amendment into the statute.

Now, let us again refer to the part of the statute which we have quoted, for the purpose of determining whether it can be applied to grants and gifts inter vivos made in contemplation of death, as well as grants and gifts causa mortis, without giving it a retroactive effect, because, if it can be, the plain and unambiguous language of the statute must govern and be given its usual and ordinary meaning, and should not be restricted to the latter class of gifts only. The act speaks from the time it takes effect, and seems to us very clear and plain that the vesting of the beneficial interest in possession or expectancy, which is the condition precedent to the right to tax, is a future event,—an event occurring after the passage of the act, and cannot be held to apply to a beneficial interest already vested in possession or expectancy. This doctrine is clearly recognized in the Seaman Case, 147 N. Y. 69, 41 N. E. 401. Then, again, the verbs "shall" and "become" and the adverb "when," as they are employed in the act, clearly refer to future, and not to past, events. The act then provides that the tax shall then be imposed, at the time indicated, upon the transfer of property, "whether made before or after the passage of this act." We understand this to mean that the instrument or act creating the transfer or right of succession may, in a possible case, have been executed before the passage of the act in contemplation of death, or intended to take effect at or after death; and where the event happens after its passage, which vests for the first time a beneficial interest in possession or expectancy, it is subject to the rights of succession or taxation, but if both the transfer or right of succession and the vesting of the beneficial interest, in possession or expectancy, occurred before the passage of the act, the same could not be subjected to taxation thereunder, by reason of the fact that, as we have already seen, the vesting of the beneficial interest is an event which must occur after its passage; otherwise, it is not taxable. In the view which we take of this case, it is unnecessary to discuss or determine the application of this language to the case of wills or other instruments affecting the transfer of property, executed before the passage of the act, in respect to whether the statute would be considered retroactive as to them. For the purposes of this case, we may treat the language as applying only to those cases immediately preceding it in the same subdivision, namely, grants or gifts made in contemplation of death, or intended to take effect at or after death. In the case under consideration the transfer by gift was made after the passage of the act. It seems clear that this statute can have no retroactive effect when applied to grants or gifts inter vivos made in contemplation of death. A gift inter vivos is a gift in præsenti, a consummated and completed act, and has no reference to past or future acts or events. It would be an impossibility to have a gift inter vivos created by an instrument or act made prior to the passage of this act take effect upon the happening of an event which should occur after its passage. It would lack the essential elements necessary to constitute such a gift, namely, immediate delivery and the passing of an irrevocable title. This statute can have a prospective operation when applied to this class of gifts, but, as we have seen, it can have no retroactive effect with respect to them.

In the construction of statutes, it ofttimes is of material aid, in determining the true legislative intent of a statute or an amendment, to look to the cause or necessity therefor, and the defect or mischief which it is sought to remedy. The statute, as it existed prior to the enactment of chapter 399 of the Laws of 1892, subjected to taxation transfers by deed, gifts, etc., intended to take effect at or after the death of the grantor or donor; but it did not impose a tax upon grants or gifts made in contemplation of death. It therefore might have been possible, if not a practice, for persons who knew or believed that they were about to die to give away their property, thereby avoiding the transfer tax; and it is very obvious that, by incorporating this amendment into the statute referred to, which brought grants, gifts, etc., "made in contemplation of the death of the grantor, vendor, or donor," under the operation of the statute, the legislature intended to remedy this defect. Now, if we are to say that this language applies only to gifts causa mortis, and was not intended to cover gifts inter vivos made in contemplation of death, then all that will be necessary for a person who contemplates that he is about to die to do, in order to defeat the provisions of the statute, is to make an absolute and irrevocable gift,—a gift inter vivos. If we hold this to be the meaning of this language, it seems to us that it will defeat the very purpose of the amendment. As we have already stated, gifts causa mortis were probably covered by the statute before the amendment; and to hold that the amendment is not to apply to gifts inter vivos made in contemplation of death will be to render the language thereof nugatory. We do not believe that such was the intention of the legislature, or that such is the correct interpretation of the statute; and we therefore hold that the transfer of the real property in question, by the deeds of gift from the testatrix to these nieces, her residuary legatees, is taxable.

We have examined with considerable care In re Seaman, 147 N. Y. 69, 41 N. E. 401, and In re Green, 7 App. Div. 339, 40 N. Y. Supp. 1019. (The latter case was reversed, upon other points than those under consideration, in 153 N. Y. 223, 47 N. E. 292.) Both of these cases discuss the meaning of the language employed in the amendment to which we have referred. In the Seaman Case the court says that the language employed evidently refers to gifts causa mortis, but does not, directly or by necessary inference, hold that gifts inter vivos, made in contemplation of death, are excluded from its operation and effect. The fact in that case was essentially different from that in this case. The question in that case arose under a will which was made and went into effect long before any taxable transfer law was enacted. We think that neither of the cases cited is controlling in this case. The question under consideration here was not involved in either of them. Neither are we aware that this precise question has ever been passed upon by any court. We have therefore treated it as an original proposition, and have given to the statute an interpretation which seems to us to be in accord with the legislative intent in enacting it, and which, as it seems to us, gives to the language employed its ordinary signification. Decreed accordingly.