The testimony and the documentary evidence show that the defendant, in ignorance of any title or claim of title by the plaintiff, paid off two certain mortgages which were upon the premises at the death of the testator, and hence the judgment should be without prejudice to a lien for the amount paid in discharge of the mortgages, or to be subrogated to the rights of the mortgagee. Smith v. Robertson, supra. It also appears that the defendant in like ignorance has paid for taxes, assessments, repairs, and improvements. The plaintiff is not entitled to partition unless the equitable rights of her co-tenant are respected. Ford v. Knapp, 102 N. Y. 135, 140, 141, 6 N. E. 283, 55 Am. Rep. 782; Jones v. Duerk, 25 App. Div. 551–560, et seq., 49 N. Y. Supp. 987; Fiero, Sp. Proc. vol. 1, 195, and authorities cited. I shall not attempt to define the exact measure of relief, inasmuch as the court in Ford v. Knapp, supra, say:

"Every case of the kind must be determined upon its own facts and surroundings, and those may occur in which such an allowance would be unjust and inequitable."

The judgment must, therefore, be reversed and a new trial granted, costs to abide the final award of costs. All concur.

---

(117 App. Div. 360)

## In re PALMER'S ESTATE.

(Supreme Court, Appellate Division, Third Department. January 18, 1907.)

**1. GIFTS—INTER VIVOS—SUFFICIENCY OF DELIVERY.**

The delivery of an inventory of decedent's assets, with an instrument attached thereto assigning them to his son, was sufficient delivery to complete a gift inter vivos.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gifts, § 37.]

**2. TAXATION—TRANSFER TAX—PROCEEDINGS FOR ASSESSMENT—WEIGHT OF EVIDENCE.**

In a proceeding for an assessment of an estate under the transfer tax act, evidence *held* to show that an assignment of property by decedent to his son a few months before decedent's death was not intended as an absolute gift, but for the purpose of passing the property to decedent's heirs in accordance with his will.

**3. SAME—CONSTRUCTION OF STATUTE—GIFTS INTER VIVOS.**

The statute taxing transfers of property made "in contemplation of death" includes gifts inter vivos, as well as gifts causa mortis.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, §§ 1700, 1702.]

**4. SAME—WEIGHT OF CIRCUMSTANTIAL EVIDENCE.**

In a proceeding for the assessment of property under the transfer tax act, circumstantial evidence that a transfer of property was made in contemplation of death may overbear positive testimony of an interested party to the contrary.

Chester, J., dissenting.

Appeal from Order of Surrogate, Albany County.

Proceeding for the appraisal of the estate of John Palmer under the transfer tax act. From an order of the surrogate, the Comptroller of the state of New York appeals. Reversed and remitted.

John Palmer, of Albany, died upon the 15th day of April, 1905, at the age of 62 years. He had been in the war of the Rebellion, and from injuries re-

ceived in said war he had gradually developed a disease known as "multiple neuritis," which was the final cause of his death. About 18 months prior to his death his mind began to weaken, and about December 1, 1903, he went to a sanitarium at New York for treatment, and there he remained about 6 weeks. He then returned to his home in Albany, where he remained until he died. During the year 1904 he was somewhat improved, and in the summer of 1904 he was in sufficiently good health to go out driving every day. It was difficult for him to walk, but he was not confined to his bed. While the doctor feared that his mental faculties would gradually weaken and his mind perhaps give way entirely, he thought his physical powers would remain sufficiently unimpaired to allow him to live considerable time and perhaps several years. In the month of January, 1905, he seemed to be considerably improved and in fair condition, both mental and physical, though it was apparent that he was gradually weakening, both physically and mentally. This was one of his best months since his return from the sanitarium. Upon the 10th day of January, 1905, he made, without consideration, an assignment of all of his property to his son, Rufus King Palmer. The assignment was in this form:

"John Palmer, Senior, residing at 728 Madison avenue, Albany, N. Y., declares that this is a schedule of his assets alphabetically arranged and assigned to his son, Rufus King Palmer, and that the said Rufus King Palmer has absolute control of the assets herein named.    John Palmer."

The book with this assignment attached was delivered to Rufus Palmer. No counsel was called in, and the instrument was written out by the decedent personally. Rufus Palmer swears that at no time was anything said about the transfer tax or evading the transfer tax. Rufus was the eldest son of the decedent, and for a period of 15 years Rufus has had from his father a general power of attorney  At the time of the transfer to Rufus he swears that it was mutually understood, although there was no actual agreement to that effect, that Rufus should properly look after the welfare of the mother, brother, and sister, and also said decedent, in the same manner as said decedent had always done.

Upon the 14th of February following this assignment Rufus took most of the property assigned from his father's box, and put it in a box to be held in the name of three trustees—himself, William S. Hackett, and Edward G. Sherley—with provision that this box should only be opened in the presence of two of said trustees. These trustees were the same persons mentioned in his father's will as executors and trustees. A small part of the securities in his father's box, to wit, the sum of $15,000 or $20,000, he allowed to remain in the box, claiming that he did not accept those, and the value of those securities has been inventoried as part of his father's estate. On the 8th day of March, at his father's request, some slips were given to him, and he directed the transfer of the bank accounts in three several banks to be transferred to an account in the name of "John Palmer or Rufus K. Palmer, payable to either or the survivor of either." From the securities transferred upon March 10th no moneys ever came back to the possession of John Palmer. They were all collected by the trustees, and paid over, a part to Mrs. Palmer, the wife of John Palmer, and the remainder divided among the children of John Palmer. The same proceeding was had after the death of John Palmer, at which time the balance of the property was placed in this trustee box subject to the control of the three trustees. Upon January 10th, when the assignment was made, John Palmer, while a good deal crippled, did not expect to die at once, and was even talking about taking a trip to Europe in the spring. He stated to one of his trustees that the management of his property was getting to be a burden to him, and he had every confidence in his son Rufus, to whom he afterwards made the assignment. After the death of John Palmer, Rufus Palmer made an affidavit in the Matter of the Collection of the Inheritance Tax, in which he stated that the property of John Palmer amounted to $84,000. This included some $64,000 which was contained in the three bank accounts which were then in the name of John Palmer or Rufus Palmer, as before specified. He afterwards explained that he made this affidavit without discussing the facts with his counsel and understanding that the peculiar situation of those accounts made them the property notwithstand-

ing the assignment to himself, but that after discussing the facts with his counsel he had discovered hat he was the absolute owner in law, and that the said $64,000 should not be included in his father's estate. Upon these facts the surrogate has held exempt from taxation all the property transferred to Rufus by the assignment of January 10, 1905, including the funds in the three bank accounts which were afterwards placed in the name of John Palmer or Rufus Palmer. The report of the appraiser was affirmed pro forma, and upon appeal the pro forma decree was confirmed, and from the order or decree of confirmation the Comptroller has taken this appeal. Further facts appear in the opinion.

Argued before SMITH, CHESTER, KELLOGG, and COCHRANE, JJ.

Mead & Hatt (George J. Hatt, of counsel), for appellant.
Bender & Hinman (Melvin T. Bender and Harold J. Hinman, of counsel), for respondents.

SMITH, J. That Rufus King Palmer took the property under this assignment for the purpose of passing the property to the widow and children of John Palmer in precise accordance with the plan of distribution in the will of John Palmer seems to me of irresistible inference. With a widow, two sons, and a daughter, John Palmer never gave that property absolutely to his son Rufus. Moreover, Rufus swears upon the stand that there was an understanding, which he does not admit amounted to an agreement, that he would take care of his mother, brother, and sister "in the same manner as decedent had always done." From the date of the transfer, upon January 10th, until the time of John Palmer's death, not one act of Rufus in the handling of this property is that of an independent owner. On the contrary, every act is in accord with the recognition on his part that the property was his father's, and that the transfer was simply a means to accomplish the passing of the property to his father's heirs. The bank accounts remained in the name of his father until his father directed Rufus to give to him a bank slip, upon which he directed the accounts to be transferred to "John Palmer or Rufus K. Palmer, payable to either or the survivor of either." This fact of itself is not without significance of the fact that the act was done "in contemplation of death." The securities of the deceased were not changed from the safe deposit box of John Palmer until they were put into a safe deposit box in the name of Rufus Palmer, William S. Hackett, and Edward G. Sherley, who happened to be the trustees named in the will of John Palmer. These securities were put in this safe deposit box under the condition that they could be drawn, not by Rufus alone, but only by two of the three trustees. The exact nature of that trust is not shown. Upon this point the son Rufus is evasive. If he made the trust of his own volition, it is inconceivable that he should be unable to state its exact terms. If the trust were, however, for the purpose of carrying out the provisions of the will of John Palmer, there is good reason why the exact terms of the trust should not here be shown and the respondents are the only ones who have the power of showing by direct evidence just the extent and nature of that trust. After the death of his father the remaining securities belonging to the estate were placed in the same trust box, although they must be administered

under the direction of the trust contained in the will. Again, all income collected from securities was divided by Rufus between his mother, his brother, and sister, and himself, as is evident, under his father's direction, either under the terms upon which he originally took the property or at the time of the collection of the moneys. After the death of John Palmer, Rufus Palmer makes affidavit in which he states that the property of his father amounts to $84,000, which includes these three bank accounts which had been placed by direction of his father in the name of his father and himself, "payable to either or the survivor of either." The inconsistency of the position that these bank accounts belonged to the father, and that the rest of the property was his absolute property, did not appear so clearly to Rufus as it did afterwards to his counsel, who advised him that the property under the assignment was all his property, except the small amount which he did not accept and remove from his father's safe deposit box.

It may be that John Palmer was not anticipating immediate death. He had been sick, however, for many years, and for the last 14 months prior to the making of this assignment he had been much worse. His mind was affected and his physical infirmity increased. That he was contemplating the contingency of death when he made this transfer seems to me undoubted. The absolute transfer with the secret trust, the apparent subsequent direction by him of the estate, the grasp that he still held upon the bank accounts, the transfer of the securities to the same trustees designated in his will before his death pass beyond suspicion, and point unerringly to an intent upon his part to provide for the passing of his estate after he was gone. The only reason assigned by these respondents for this transfer is that the estate had become a burden upon him, and as he had full confidence in Rufus he wanted to pass it over to his hands. This reason, however, has little weight when it appears that for 15 years the son Rufus, in whom he had so great confidence. held a general power of attorney, and could with equal force have accomplished his purposes under that power of attorney as under the formal assignment made. If this order of the surrogate stands, a man facing death has by indirection bequeathed his property and evaded payment of his share of the burden of taxation. As against just such transfers, as I understand, the Legislature intended to provide when it declared subject to taxation transfers made in contemplation of death.

The respondents urge certain legal objections to a construction of this gift as made in contemplation of death. That the gift was in form inter vivos rather than causa mortis is clearly shown. The delivery of the inventory with the assignment thereupon was a sufficient delivery to complete the gift. That the gift was in trust, and not to Rufus absolutely, would be held by any court, wheresoever the question should arise, upon the testimony of Rufus himself and upon his subsequent conduct, which gives color to the motive of the gift. That trust, however, was not a trust for John Palmer so much as it was a trust for his widow and next of kin, and therefore that trust does not come within the condemnation of the trust in the case of Cornell's Estate, 170 N. Y. 423, 63 N. E. 445, or the case of Brandreth's Estate, 169 N. Y. 437, 62 N. E. 563, 58 L. R. A. 148.

It is strenuously urged, however, that this expression, 'in contemplation of death," under the authorities, refers simply to a gift causa mortis, and does not include a gift inter vivos. This contention is not unsupported by authority. Such a construction was given to the phrase in the Matter of Seaman's Estate, 147 N. Y. 76, 77, 41 N. E. 401. In that case, however, the question did not arise in the same way as it is here presented. It was not necessary there to decide that a gift inter vivos, made before death and for the purpose of avoiding the payment of this tax, would not be a gift in contemplation of death. In the Matter of Edgerton's Estate, 35 App. Div. 125, 54 N. Y. Supp. 700, Merwin, J., in our own court, seems in part to recognize this as the rule of law. Other cases in the Appellate Division may be cited where in the prevailing opinion this rule of construction is in part relied upon, which have been affirmed in the Court of Appeals without opinion, but the affirmance in the Court of Appeals was not in any case a necessary approval of this construction of the statute.

On the other hand, in the Matter of Cornell's Estate, decided in this court and reported in 66 App. Div. 169, 73 N. Y. Supp. 32, Judge Chase, in writing for the court, says:

"If a transfer of property is made for the purpose of cheating the law and avoiding payment of the transfer tax, it may well be that a gift so made, although absolute and unconditional, is made in contemplation of death, and that a tax should be paid thereon, although the grantor, vendor, or donor may live for many years thereafter, but with such exception the rule fairly to be deduced from all the authorities is that the words 'in contemplation of the death' refer to a gift causa mortis."

While this decision was reversed, the construction of the statute thus given was not overruled. Under chapter 713, p. 921, of the Laws of 1887, the language of the statute provided for the taxation of gifts "intended to take effect at or after death." This language was construed in the Matter of Edwards, 85 Hun, 436, 32 N. Y. Supp. 901, to include gifts causa mortis. In 1892, however, the statute was amended to make subject to the tax also transfers "made in contemplation of death." If under the act of 1887 gifts causa mortis were taxable, it would seem that the amendment of 1892 intended to add something to the statute. To hold that that refers alone to gifts causa mortis would be to hold that such amendment was surplusage and added nothing. This is the view taken of the statute in the Matter of Birdsall's Estate, 22 Misc. Rep. 180, 49 N. Y. Supp. 450, wherein Surrogate Woodbury holds that a gift inter vivos made for the purpose of avoiding the tax was taxable under the statute. This decision was affirmed in the Fourth Department in 43 App. Div. 624, 60 N. Y. Supp. 1133. The authorities in this state upon this question are not entirely satisfactory. In Illinois, however, a similar statute has been construed, and the phrase in "contemplation of death" has been clearly interpreted. In Rosenthal v. People, 211 Ill. 309, 71 N. E. 1121, Mr. Justice Cartwright, in writing the opinion of the court, says:

"A gift is made in contemplation of an event when it is made in expectation of that event and having it in view, and a gift made when the donor is looking forward to his death as impending, and in view of that event, is within the language of the statute. With that understanding of the law there is no doubt that the gift in this case was made in contemplation of death. The prep-

aration of the will, under the circumstances and in view of the rapid progress of the disease, is strong evidence that death was expected, and no other moving cause than the expectation of death is apparent. While the widow and physician testified that the deceased did not expect to die, they also said that it was not the subject of conversation at all, and, in view of his condition, it is a fair inference that he was not so dull of comprehension as to suppose that he would get well."

In that case a gift inter vivos was held taxable. The same rule is held in the Estate of Merrifield, 212 Ill. 405, 72 N. E. 446, where Mr. Justice Hand writes:

"It is said, however, by appellants, that a transfer of property made without consideration, in contemplation of death, is a gift causa mortis, and that the stipulation is that the gift was absolute. Hence it could not be a gift causa mortis, as a gift causa mortis is conditioned upon the death of the donor. A gift causa mortis, strictly speaking, applies only to personal property, and the gift is defeated if the donor recover. In this case the subject-matter of the transfers was both real and personal property, and the transfers were absolute, and not upon the condition that they should be revocable in case of the recovery of the donor. They were, however, made in contemplation of his death. They fall, therefore, more nearly within the description gifts inter vivos made in contemplation of death, than within the designation gifts causa mortis."

Finally, the respondents contend that the burden of proof is with the Comptroller to show that this gift was made in contemplation of death, and that the only positive evidence is to the contrary. Efforts to evade the law are secret, and not public. Witnesses are not called in to attest them. The evidence to prove the same must of necessity be circumstantial rather than direct, and such circumstantial evidence may overbear the positive testimony of an interested party who swears to the contrary. The effect of this transfer is to pass the property to the next of kin of the deceased exactly as it would have passed by will had this transfer not been before made. There is no moral reason why this property should not be taxed as though the property had passed three months later by the will of the deceased. Courts should not be overzealous to protect an estate from taxation and to shield parties by a presumption of innocence where no other rational motive for a transfer is shown, and no reason appears why the estate itself should not bear its just proportion of the public burden. The final order or decree of the surrogate should be reversed on the law and facts, and the matter be remitted to the surrogate for disposition in accordance herewith.

Order or decree of surrogate reversed on law and facts, and matter remitted to the surrogate for further disposition, without costs.

COCHRANE, J. I concur in the result. I do not think, however, that it is necessary to hold that the transfer in question was made "in contemplation of death," within the meaning of the tax law. But it is quite clear to me that under the instrument of January 10, 1905, Rufus King Palmer, the son of the decedent, took no title to the property therein mentioned. The transaction in form was sufficient to constitute a gift inter vivos. But the law penetrates beneath the surface of a transaction, and considers not its form, but its purpose. That purpose is correctly indicated by Rufus himself in the following lan-

guage in his affidavit, taken before the appraiser and used as evidence
in this proceeding, viz.:

"To relieve himself of the burden of his estate, in view of his illness and
through fear that his illness might be a lingering one, attended by weakened
mental capacity which might incapacitate him to look after his own and his
family's welfare, all of which was so expressed to deponent by said decedent,
said decedent desired to and did transfer to deponent all of his personal prop-
erty absolutely on or about the 10th day of January, 1905."

The evidence clearly shows that Rufus was to be the custodian or
manager of the property, and that the transfer to him, although ab-
solute in form, was merely for the accomplishment of such purpose.
He was already acting under a power of attorney. It taxes human
credulity to the utmost to suppose that Gen. Palmer intended to make
a gift of this large proportion of his property to one son, to the ex-
clusion of his widow and his other children. Such an inference is
inconsistent with the provisions of his will ratified by a codicil made only
four months prior to the instrument of January, 1905, in which no such
purpose is disclosed. It is also inconsistent with every act of Rufus
after the transfer, both before and after his father's death, which acts
are confirmatory of the provisions of the will in respect to the disposi-
tion of the estate. Rufus would find it extremely difficult under the
evidence before us to maintain his title to the property against the tes-
tamentary provisions of his father. It is unnecessary to give rein
to the imagination to reach the conclusion that a gift was not in-
tended. It requires an extremely lively imagination to reach the con-
trary conclusion. The deceased did not intend to exclude his family
from participation in his estate and make them dependent on the
bounty or liberality of one member thereof. Having due regard to the
form of the transaction, nevertheless, the actual purpose thereof, as
clearly indicated by the evidence, was to relieve the owner of the
property from the care and management thereof without divesting him-
self of the title thereto. Such property, therefore, passed under the
will of the deceased, and is subject to the tax.

KELLOGG, J., concurs with COCHRANE, J. CHESTER, J.,
dissents.