NOEMIE DUBAR HART, INDIVIDUALLY, AND NOEMIE DUBAR HART AND ARNOLD A. HART, AS EXECUTORS OF THE ESTATE OF M. NOEMIE ROUSSEL, DECEASED, APPELLANTS, v. AARON K. NEELD, DEPUTY DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF TREASURY, STATE OF NEW JERSEY, RESPONDENT.

IN THE MATTER OF THE TRANSFER INHERITANCE TAX ASSESSMENT IN THE ESTATE OF M. NOEMIE ROUS-SEL, DECEASED.

Argued April 30, 1956—Decided May 14, 1956.

*Mr. George F. Losche* argued the cause for appellants (*Messrs Losche & Losche,* attorneys).

*Mr. Joseph A. Jansen,* Deputy Attorney-General, argued the cause for respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

WACHENFELD, J. This appeal from a determination of the Transfer Inheritance Tax Bureau calls into question the application of *N. J. S. A.* 54:34–2.1 to a somewhat unusual factual situation. The statute involved provides for the taxation of any "transfer of property passing to any child to whom the decedent for not less than ten years prior to such transfer stood in the mutually acknowledged relation of a parent," at the same rates and with the same exemptions as are applicable in the case of a transfer from a parent to a natural child.

The decedent, the natural aunt of the appellant, died in 1953, naming the moving party as the principal beneficiary of her estate, the gross value of which was reported as approximately $170,000. An inheritance tax report was filed by the executors of the decedent's estate, resulting in an assessment issued by the Bureau on July 22, 1954. No objection was filed to the assessment so made, and time in

which to appeal from the assessment expired on September 9, 1954. *R. R.* 1:3–1(*b*).

On October 13, 1954 counsel for the executors wrote to the Bureau requesting a reduction in the assessment and a refund of inheritance taxes paid, claiming that while the blood relationship between the decedent and the appellant was that of aunt and niece, nevertheless the niece was entitled to an exemption based upon *N. J. S. A.* 54:34–2.1 by virtue of a "mutually acknowledged" parent-child relationship existing between them. Although the letter did not cite any statutory authority for the granting of a refund, the writer had obvious reference to *N. J. S. A.* 54:35–10, which provides, in substance, that a taxpayer may obtain a refund of taxes paid, at any time within three years from the date of payment of the tax, upon satisfactory proof that the amount of tax paid was in error.

The Bureau responded to the letter stating it would give consideration to whatever proof the executors might care to submit to establish the alleged parent-child relationship between the decedent and the appellant. Subsequently, several affidavits were proffered by counsel for the executors in support of the claim made, and testimony was taken by the principal examiner of the Bureau on January 20, 1955.

On April 7, 1955 the examiner issued his findings, holding the proof submitted failed to establish the alleged relationship as contemplated by *N. J. S. A.* 54:34–2.1, and he accordingly notified the executors their claim for a refund was denied.

An appeal to the Appellate Division from this determination was filed on May 23, 1955. The respondent there moved to dismiss the appeal, claiming it was not filed within 45 days from the date of the original assessment of taxes due. The motion was denied without opinion, and certification was sought from the order so entered, which also was denied by this court. 20 *N. J.* 465 (1956). However, we subsequently granted certification on our own motion prior to any argument of the appeal on the merits in the Appellate Division.

The respondent persists in the objection that the appeal was not timely filed. While the denial of the motion in the Appellate Division and our subsequent refusal to grant certification therefrom would, under ordinary circumstances, constitute a final disposition of this contention, we shall nevertheless pause briefly to point out the error of the reasoning pursued.

Respondent contends that a taxpayer's only recourse in the case of an overpayment of taxes is an appeal from the original assessment, and that no appeal will lie from the denial of an application for a refund. However, nothing contained in the Transfer Inheritance Tax Law limits the right of appeal to an assessment only. If the Legislature has accorded taxpayers the right to make application for a refund, in the absence of any contrary expression it must be deemed to have intended that an appeal would lie from an adverse determination thereon in the same manner as in the case of any other administrative action.

██ As previously indicated, the appeal, according to the notice, was taken not from the original assessment made by the Bureau on July 22, 1954, but from the subsequent determination denying appellant's application for a refund pursuant to *N. J. S. A.* 54:35–10. The effect of the latter decision was to deny a right asserted by the claimant to relief under the transfer inheritance tax statutes, and it was in all respects a final action by an administrative agency of the State. Hence, the Bureau's decision was appealable, just as much so as was the original assessment. See *R. R.* 4:88–8(a).

Turning to the merits, the facts relied upon by the appellant to establish the "mutually acknowledged" parent-child relationship between herself and her aunt are as follows: the decedent and the appellant's mother, Mrs. Dubar, were sisters, and in about 1903 they jointly purchased a home in East Orange in which they lived together until Mrs. Dubar's death in 1937. In 1909, appellant's mother married Dr. Dubar, and her husband moved into the East Orange home with his bride and her sister. The appellant was born the

following year in the same home. Dr. Dubar died when she was five weeks old.

Following Dr. Dubar's death, the sisters continued to make their home together in East Orange and also maintained a summer home at Avon. Both sisters had independent means, for the testimony indicates they lived very comfortably and traveled extensively.

The sisters were extremely close. According to the testimony, they contributed jointly to all expenses of the household and shared the costs of appellant's care and education. They cooked together, traveled together and in general pursued life with one another in what seems to have been an ideally harmonious relationship.

In this contented household appellant was reared, and she enjoyed the love, care and affection equally of both women. However, it is appellant's thesis that following her father's death in 1910, her mother was emotionally upset and to some extent withdrew from worldly affairs, leaving to her sister the more important problems and decisions involved in rearing her child. Thus, the appellant testified that when it came to a choice of college and the arrangements therefor, her aunt, rather than her mother, initially made the decision.

Appellant married in 1930 and moved into her own household, but she frequently visited her mother and her aunt and spent holidays with them. The visits to the decedent continued following Mrs. Dubar's death in 1937, and, if anything, that event brought the aunt and niece closer together than before. Following her aunt's death, a paper entitled "Memorandum for Noemie," dated October 10, 1950, was found among the aunt's effects, in which she said, in part:

"Anything you do is o.k., you have been a daughter to me for which I love you and thank you. * * *"

While the relationship existing between this appellant and her aunt was heartwarming, the basic issue posed by the statute under which an exemption is sought is whether there was a "mutually acknowledged" relationship of parent and

child. On that subject, a few short excerpts from appellant's testimony are quite revealing:

"* * * Well, I think Mother is the one that brought me up and took care of everything, my Mother and my aunt.

* * * * * * * *

My Mother and my aunt shared in everything from the time I was born.

* * * * * * * *

Well, my aunt felt that I was as much hers as I was my Mother's, and they had always shared things together and I belonged to both of them, therefore she shared in everything, my clothes, trips abroad, camp, anything that came along they shared for me, theater seats, anything at all.

* * * * * * * *

It made no difference, if I was hurt, I would run to her as well as I would to my Mother, whichever one came first. And I would always talk to her about anything, just as much as I would to my Mother * * * I suppose as other children would consider a mother and father, I considered my Mother and aunt.

* * * * * * * *

* * * They made all decisions together.

* * * * * * * *

My aunt was the more forceful. She was usually the one that took the upper hand and would make the plans and Mother usually followed through.

* * * * * * * *

Well, she [appellant's mother] took care of me jointly with my aunt. They kept house, attended to my welfare.

* * * * * * * *

They both loved me. I mean, I wouldn't say one more than the other.

* * * * * * * *

My aunt was Tadie, which was half French and half English. My mother was Mommy. That was all.

* * * * * * * *

I never said, 'I am going to visit my Mother.' 'I am going to visit Mother and Tadie. Mother and Tadie and I are going to New York together.' It was never one or the other. The two were just one. It just went together."

From these excerpts it is abundantly apparent that (1) neither appellant nor her mother ever abandoned the natural relationship which existed between them, and (2) no matter how close the relationship between her and her aunt, she nevertheless distinguished in her own mind between her

mother and her aunt, at least in the sense that she always referred to her mother as "Mother" and to her aunt by a different name.

Furthermore, it is not denied that appellant's mother was a woman of independent means, having left an estate, of which appellant was the principal beneficiary, in excess of $90,000, and that she was financially able to rear her daughter without the contributions of her sister. It is also not denied that at the time of her natural mother's death, appellant claimed and received an exemption based upon a parent-child relationship existing between them.

We fully concur in the finding made by the examiner below that on these facts no "mutually acknowledged" relationship of parent and child existed between the decedent and the appellant within the purview of *N. J. S. A.* 54:34–2.1. To hold otherwise would stretch the statutory exemption well beyond the meaning evidently intended by the Legislature. The inescapable fact is that the appellant had a natural mother with whom she resided until she married, and her mother, while she may have been emotionally incapacitated to a degree, nevertheless continued to assume her maternal obligations and shared in her daughter's upbringing. Simply because the appellant looked to her aunt for advice and comfort as much or even more so than to her mother does not qualify her to an exemption for a parent-child relationship. So long as she continued to acknowledge her natural mother as her parent, which she did, she could not, in the statutory sense, at the same time acknowledge another as occupying the same relationship. An overfond aunt does not automatically become a mother by reason of her excessive affection.

Indeed, appellant has already had one exemption from inheritance taxes, based upon a parent-child relationship, in her mother's estate. It would seem quite obvious that one mother per child exhausts the exemptions provided for by statute, and it is difficult to conceive a legislative intention to surpass nature itself by endowing a child with more than one maternal parent.

Recognizing the limitations imposed by nature, the appellant pursues a different approach and urges the exemption be granted on the theory of the aunt's being a father to her, rather than a mother. The basis for this suggestion is that the aunt was the dominant member of the household and in reality occupied the role normally played by the father.

The changing of an aunt into a father as here endeavored cannot be accomplished by legal transfusions administered either by the Legislature or the judiciary. The field seems to have been preempted by nature at a very early date.

The judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, JACOBS and BRENNAN—6.

*For reversal*—None.