[Civ. No. 21819.    First Dist., Div. Three.    July 31, 1964.]

ALBERTIS L. LOOMIS, as Executor, etc., Plaintiff and Respondent, v. STATE OF CALIFORNIA, Defendant and Appellant.

Charles J. Barry, Milton D. Harris and Francis J. Muldoon for Defendant and Appellant.

Hutton & Foley, John W. Hutton and Edward J. Foley for Plaintiff and Respondent.

DEVINE, J.—Subdivision (c) of section 15110 of the Revenue and Taxation Code of California has never been judicially construed, although it has been a law (in its present habitation in the Revenue and Taxation Code and in its earlier domicile, the Gift Tax Act [Stats. 1939, ch. 652, p. ·2082]) since 1939, and it is our present task to give the initial interpretation.

Subdivision (c) defines Class A donee as: ''A donee to whom the donor for not less than ·10 continuous years prior to the transfer stood in the mutually acknowledged relationship of a parent, if the relationship commenced on or before the donee's fifteenth birthday.''

A Class A donee is the most preferred; he receives the highest exemption (Rev. & Tax. Code, §§ 15421, 15422, 15423, 15424) and the lowest rates of taxation (Rev. & Tax. Code, §§ 15205, 15206, 15207, 15208). The donee won this favored classification in the trial court, and was awarded judgment for $1,031.07 as an overpayment of gift tax, but the State Controller appeals from the judgment, and contends that the donee's proper class is D, which is that of ''stranger'' to the donor.

## The Facts

The facts, which are undisputed, were presented to the trial judge in exceedingly compact form. They are these: Bruce Loomis was the recipient on September 30, 1959, of a gift from Bert Loomis and Pearl Loomis consisting of an undivided 7/16 interest in a farm implement, sales, service and manufacturing business. The donee, Bruce, is the son of Bert and Rose Walker Loomis. After his natural parents were divorced and at the time the donee was 9 years of age, his father married Pearl Loomis. The donee had been living with his father, and continued to do so after his father's remarriage.

His stepmother kept house for her husband and his son, Bruce. She cooked meals, did laundry and mended clothes, without demand for or receipt of compensation from the boy. She occasionally signed school absence excuse notes and report cards. The donee occasionally would ask her advice on personal matters, and she would give it. His father expressed to him a wish that he submit to the control and authority of Pearl Loomis and he did so, willingly for the most part. The father testified that he and Pearl Loomis exercised authority and control over Bruce. The donee resided with his father and stepmother until he was 19 or 20 years of age. He saw his stepmother regularly after he left the home until her death in 1962.

During the 10 or 11 years in which Bruce lived with his father and with Pearl, he was supported from community property, that is, the wages of his father. Neither his father nor Pearl ever asked Bruce to help contribute for his support, and he paid nothing therefor. Pearl did not object to the father's using his wages to support Bruce.

Bruce visited his natural mother irregularly and, by his statement, "Generally infrequently—possibly once a month." Rose also visited her son at his father's residence infrequently; according to the father's testimony, "Oh, maybe at Christmas time or something like that."

Bruce addressed his stepmother as "Pearl," but continued to call his natural mother "Mom," for the reason that "My mother was living; I called her 'Mom.'" Bruce's natural mother died in 1958, a resident of Pomona. As to inheritance from his natural mother, Bruce testified, "there was one diamond was made into a pair of earrings that my wife has; that was the only inheritance from Mom." It does not appear whether the natural mother died in California or

elsewhere; whether her estate was ever administered; whether any tax was paid; nor is the value of the diamond stated.

The controller concedes that the relationship claimed by respondent was seasonably commenced and was of sufficient duration to satisfy the requirements of section 15110, subdivision (c), but denies that a mutuality of acknowledgment could exist "simultaneously with recognition of and visitations to and from" the donee's natural mother during the period required by the statute. The controller's counsel came close to conceding, at the trial, that the donor stood *in loco parentis* as to the donee. It is contended that the concession was merely *arguendo*, and we are willing to regard it as something less than a stipulation of fact, because the statement was made impromptu, in the course of a series of questions by the judge and because the interest of the controller is not private, but public; but the admission, though qualified, is of some significance because it tends to show the force of the evidence in favor of respondent.

### Stepmother as Standing *in Loco Parentis*

The relationship of stepparent to stepchild does not in itself place the stepparent *in loco parentis* to the stepchild. (*Trudell* v. *Leatherby*, 212 Cal. 678, 681 [300 P. 7].) However, a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship, without going through the formalities necessary to legal adoption, does stand *in loco parentis*, and the rights, duties and liabilities of such person are the same as those of the lawful parent (p. 682).

The evidence of parental relationship produced in this case relates to three subjects which, indeed, probably are the most significant in any case where it is claimed that one stood *in loco parentis*. The first is that of support. This, of course, is a better test when the stepparent is the father than when the stepparent is the mother, because when the stepfather undertakes the obligation of support he gives evidence (not necessarily conclusive) of his assumption of the role of parent; but when the natural father remarries, his obligation to support the child simply continues. (*Estate of Smith*, 200 Cal. 654, 659 [254 P. 567].) Nevertheless, the fact that the stepmother, Pearl Loomis, apparently gave an ungrudging consent to the use of community funds, her husband's earnings, to the boy's support, is some indication of her taking the part of parent. The next factor is that of performance of

the multifold household duties for the boy's benefit, for at least a decade. The stepmother was under no legal obligation to perform these tasks for the boy. If, however, the boy had become possessed of property, and if Pearl had sought to recover on quantum meruit for her services, it is probable that a successful defense would have been made on the boy's behalf, on the ground that the stepmother was *in loco parentis*. (*Starkie* v. *Perry*, 71 Cal. 495 [12 P. 508]; *Larsen* v. *Hansen*, 74 Cal. 320 [16 P. 5]; *Trudell* v. *Leatherby*, *supra*, at pp. 681, 682.) Finally, there is the all-important subject of discipline and advice. It is uncontradicted that this intimate element of the parental relationship was established between Pearl Loomis and Bruce.

The section with which we are concerned refers to "mutually acknowledged relationship of a parent," and the factors which we have just described, particularly the last in which responsibility for direction is undertaken by the one and obedience given by the other, constitute, in our opinion, mutual acknowledgment.

### The Natural Mother

It is conceded by appellant that the fact that the natural mother is living does not preclude the formation of a parental relationship, as described in subdivision (c) of section 15110; and this follows logically from the fact that the code section makes no provision that the natural parent or parents be deceased. Appellant does argue that when the natural parent is alive, is recognized as the parent, takes an interest in the child, and visits or is visited by the child, the mutuality of acknowledgment of parenthood required by the code section cannot exist. Since no description of conduct between the natural parent and child which would affect the operation of the code section is contained in the statute, the decision is to be made, as it was in this case, primarily by the trial judge's weighing of the evidence in each particular case. In this case, it is true that the son knew who his natural mother was, and that visits were exchanged from time to time. However, there is no showing whatever that the natural mother discharged any maternal duties, nor is there showing that the son regarded himself as bound to the usual filial obligation of obedience. He called her "Mom," and his stepmother, "Pearl," but this is simply an item of evidence the weight of which was for the trial court. In a case applying a cognate statute in New York, *In re Davis' Estate*, 184 N.Y.

299 [77 N.E. 259], the fact that the child addressed the testator and his wife as "uncle" and "aunt," and that they called her "niece," was held to be of slight importance where the facts showed the testator to have stood *in loco parentis*.

It is argued by appellant that it would be incongruous to allow more than one person of each sex to be a donor whose relationship with the donee would qualify the latter as a Class A donee. In this case, however, unlike that of *Hart* v. *Neeld*, 21 N.J. 479 [122 A.2d 611], further discussed below, there is no evidence that preference was claimed upon the death of the natural mother, Rose, nor, indeed, that there was administration of Rose's estate, in this state or elsewhere. Appellant's suggestion that appellant was at a disadvantage in the matter of information about the estate of Rose because appellant had no knowledge of anything other than the first name of the natural mother, has no merit. The information could have been acquired by simple discovery procedure, or by asking the father and the son, both witnesses at the trial.

### Nature of the Statute

The purpose of the statute under consideration, we believe to be to extend the tax benefit beyond the case where a parent-child relationship, by blood or adoption, exists, to a case where there being no such relationship, the parties, although they may recognize the fact that the natural relationship exists elsewhere, nevertheless regard each other in all of the usual incidents and relationships of domestic life as parent and child. Adoption goes farther; it severs completely all bonds formerly existing. Such complete severance is not required by subdivision (c) of the statute.

It seems to us that the statute has a beneficent purpose in recognizing relationships such as that which existed here, and that it should be construed liberally in any event, but more particularly so because it is a tax statute and, as such, is to be interpreted against the taxing authority. (*Estate of Steehler*, 195 Cal. 386, 389 [233 P. 972]; 46 Cal. Jur.2d, § 30, p. 518.) It is not an exemption statute, which would be construed against the exemption. (*Estate of Morris*, 56 Cal.App.2d 715, 727 [133 P.2d 452].) Considerable protection is afforded to the state by the requirements of the statute that the relationship continue for 10 years prior to the transfer, and that it be commenced on or before the donee's 15th birthday. In *Estate of Teddy*, 214 Cal.App.2d

113 [29 Cal.Rptr. 402], similar provisions of section 13307 of the Revenue and Taxation Code, which describes Class A transferees similarly to the description of Class A donees in section 15110, prevented the favored classification from being applied to a stepchild, although a very strong relationship had existed for almost 50 years, because the relationship, although incipient earlier, did not fully exist until the transferee was almost 17 years of age.

### Appellant's Cited Authority Distinguished

There is almost no case law on the question before us, possibly because of the extensive protection afforded to the taxing sovereignties by such restrictions in the statutes as are described in the last paragraph. Appellant cites one case, however, *Hart* v. *Neeld*, 21 N.J. 479 [122 A.2d 611], in which the legatee, the niece of testatrix, claimed the mutually acknowledged parent-child relationship, but was unsuccessful because the relationship of the legatee to her natural mother had continued. The case is distinguished from the one before us in that (1) the natural mother continued to live with the legatee and the aunt until the legatee's marriage; (2) the legatee had had the benefit of one inheritance tax preference based upon the parent-child relationship in her mother's $90,000 estate; (3) the legatee enjoyed the love, care and affection equally of both women. The fact that the legatee called her mother ''Mommy'' was but one factor in the case.

Indeed, a reading of the whole case shows that the evidence for appellant, the legatee, was so weak that her counsel chose an alternate theory, that the aunt, having been the dominant one of the two sisters, should be regarded for the purpose of the tax statute as appellant's father. The court remarked that this was beyond the power of the judiciary because the field seemed to have been preempted by nature at a very early date.

Judgment affirmed.

Draper, P. J., and Salsman, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 24, 1964.