80 Cal.App.3d 599 (1978)
145 Cal. Rptr. 759
Estate of OTTO WILTS, Deceased.
KENNETH CORY, as State Controller, Petitioner and Appellant,
v.
BANK OF AMERICA, as Executor, etc., Objector and Respondent.
Docket No. 42231.
Court of Appeals of California, First District, Division One.
May 3, 1978.
*600 COUNSEL
Myron Siedorf, Edwin Rosenthal and John D. Schell for Petitioner and Appellant.
Nichols, Catterton & Downing, M.R. Downing and Roy A. Sharff for Objector and Respondent.
OPINION
LOW, J.[*]
If a transferee is not a surviving spouse, ancestor or issue of the decedent, the transferee cannot gain the most preferred inheritance tax status, unless the decedent stood in the "mutually acknowledged relationship of a parent" to the transferee. This case asks whether this relationship was established where the transferee was not related by *601 blood or marriage and never lived in the decedent's household. We do not believe the required relationship was established in this case.
Otto Wilts died on November 6, 1974, and his holographic will of June 8, 1961, was admitted to probate. Wilts left his entire estate to Betty Barnes and six of her nine children.
In 1935 or 1936, Mrs. Rockwell (Betty's mother) divorced her husband and moved to Oakland, California, with her daughters. She was awarded custody of her children. After the move to California, Betty had no contact with her father. In Oakland, they first lived in an apartment building where Otto Wilts was also a tenant. Before Betty was 15, she and Wilts had established a close, cordial relationship. When Betty was placed in an orphanage at age five or six, Wilts partially paid the board, paid dental bills, bought her toys, visited her frequently, and took her to many recreational activities. Mrs. Rockwell testified that when she came to Oakland, her doctors had given her only five years to live and Wilts had agreed to take care of Betty the rest of her life.
When Betty was 11, she moved to Vallejo with her mother and sisters. Wilts continued to visit her three or four times a week and generously bought her clothing, groceries and gifts. He paid for Betty's business college expenses. As a child, Betty would occasionally stay overnight at Wilts' house. Wilts attended P.T.A. meetings, conferred with Betty's teachers, and occasionally disciplined her. He paid for her summer camp expenses for three or four years and visited her when she was at the camp.
Except while in the orphanage or at camp, Betty always lived with her mother and sisters, and Wilts was never a member of their household. In fact, Wilts and Mrs. Rockwell did not get along well, and Wilts was not close to any of Betty's sisters. At one time, Wilts expressed a desire to adopt Betty, but Mrs. Rockwell opposed this and no further action was taken.
Wilts continued to provide for Betty after she married. He made down payments on various homes for her and her family. Visits continued and Wilts would spend holidays with Betty's family and made gifts to her children. He lived in her home for a brief time while recovering from a broken hip. At various times Wilts referred to Betty as "his daughter." On some papers, including rental agreements, hospital admittance papers *602 and telephone references in his hospital room, Wilts listed Betty as "his daughter." At some social activities, Wilts would introduce and refer to Betty as "his daughter." On other occasions, Betty referred to Wilts as "her father" and Betty's children referred to him as their grandfather.
The State Controller appeals from a judgment that Betty Barnes and her children are Class A transferees rather than Class C transferees. Revenue and Taxation Code section 13307 defines Class A transferees, who are required to pay lower inheritance taxes, as follows: "`Class A transferee' means any of the following: [¶] (a) A transferee who is the husband, wife, lineal ancestor, or lineal issue of the decedent. [¶] (b) A transferee to whom the decedent for not less than 10 continuous years prior to the transfer stood in the mutually acknowledged relationship of a parent, if the relationship commenced on or before the transferee's 15th birthday. [¶] (c) A transferee who is the lineal issue of a child mentioned in subdivision (b)."
Previous California cases have discussed the meaning and application of the phrase "mutually acknowledged relationship of a parent" given in the Revenue and Taxation Code. No case has applied this provision to a transferee who is not related to the decedent and has not resided in the decedent's household. Section 13307 is a legislative recognition that a relationship akin to parent and child justifies the same favorable tax treatment, providing the relationship commenced before the transferee's 15th birthday and continued for not less than 10 years before the transfer. In Estate of Teddy (1963) 214 Cal. App.2d 113 [29 Cal. Rptr. 402], and Loomis v. State of California (1964) 228 Cal. App.2d 820 [39 Cal. Rptr. 820], it is said that the required relationship is equivalent to the concept of "in loco parentis," which could suggest that the relationship must be precisely the same as natural parent and child. Section 13307, subdivision (b) is not so narrow in its meaning. The law recognizes that although a natural parent-child relationship may exist elsewhere, if the parties regard each other in all of the usual incidents and relationships of family life as parent and child, the benefits of Class A transferee accrue. (Loomis v. State of California, supra, at p. 825.)
Estate of Teddy holds that the recognized criteria of a mutually acknowledged relationship of parent are the intentional assumption of parental status and the commensurate assumption of parental duties. (214 Cal. App.2d at p. 119.) Based on previous cases which have considered the application of these criteria, we look to objective factors to see if that relationship has been established. These factors might include: A *603 relationship by blood or marriage; the reception of the child into the home and treatment of the child as a member of the family; an assumption of the responsibility for support beyond occasional gifts and financial aid; an exercise of parental authority in discipline; advice and guidance to the child; and a sharing of time and affection. After a consideration of all the evidence, it must be established that each of the parties viewed the relationship as that of parent and child. These factors interconnect and show a coherent link which, if continuous and of sufficient duration, establishes the necessary relationship. Loomis v. State of California, supra, 228 Cal. App.2d 820 (dealing with an identically worded gift tax law), provides an example. For more than 10 years, since age 9, the transferee lived with his father and stepmother. The stepmother consented to the use of community funds for his support; she performed multifold household duties and provided discipline. The stepson submitted to the control and authority of his stepmother, and received guidance from her on personal matters. In contrast, the natural mother, whom the transferee frequently visited, did not assume the same responsibilities. The mutually acknowledged relationship between stepmother and stepson was established.
New York cases are helpful in interpreting section 13307 because that section is based on New York law. (McDougald v. Lilienthal (1917) 174 Cal. 698, 700 [164 P. 387].) The New York cases are prior to 1930 because after that date New York adopted an estate tax law in place of its inheritance tax law. In re Beach's Estate (1897) 154 N.Y. 242 [48 N.E. 516], states the legislative intent of the New York law in adopting the phrase "mutually acknowledged relationship of a parent." It was: "... to include, among others, those cases, not infrequent, where a person without offspring, needing the care and affection of some one willing to assume the position of a child, takes, without formal adoption, a friend or relative into his household, standing to such person in loco parentis or as a parent, and receives, in return, filial attention and service." (48 N.E. at p. 518.) The declaration of intent is quoted with approval in Estate of Teddy, supra, 214 Cal. App.2d at page 117.
The New York cases cited by respondent, which have applied the law in favor of the transferee, involve either a blood relationship (In re Spencer's Estate (1889 N.Y.) 1 Connoly 208 [4 N.Y.S. 395] [aunt-niece]) or residence in decedent's household (In re Beach's Estate, supra, 154 N.Y. 242). The States of New Jersey and Illinois, like California, have adopted inheritance tax laws based on the former New York law and contain similar language. None of the cases cited by the parties has applied the *604 law to a transferee unrelated by blood or marriage and who never lived in decedent's household. Nor have we been able to find any New Jersey or Illinois case which addressed this issue. The transferee in In re Rogers' Estate (1954) 30 N.J. Super. 479 [105 A.2d 28], lived in the decedent's home for many years. In People v. Moczek (1950) 407 Ill. 373 [95 N.E.2d 428], the transferee was the daughter of a maid who had resided in decedent's home since the age of six months. The mother had been institutionalized when the transferee was 12, but the transferee continued to reside in the home. The court permitted the favored tax treatment. In People v. Northern Trust Co. (1954) 3 Ill.2d 285 [120 N.E.2d 543], the court denied the favored status to a nephew of a deceased aunt. His mother had given him full parental care after his father's death and had supported him. The mother had refused the aunt permission to adopt. The aunt continued to provide him with many gifts and regarded him as a son, but that did not establish a mutually acknowledged relationship of parent.
Cases relating to the legitimation of illegitimate children under former Civil Code section 230, cited by the parties, are not helpful in interpreting the language of Revenue and Taxation Code section 13307. The Uniform Parentage Act enacted in 1975 (Civ. Code, §§ 7000-7018) eliminates the distinction between legitimate and illegitimate children. That act establishes legal equality of children without regard to the marital status of their parents. All children and all parents have equal rights with respect to each other. Civil Code section 7004, subdivision (a)(4) provides that a man is presumed to be the natural father of a child if he "receives the child into his home and openly holds out the child as his natural child." Unlike section 13307 of the Revenue and Taxation Code, there is no requirement that the acknowledgment begin before the child is age 15 nor need there be a 10-year continuous relationship. In addition, in such cases there is already an openly acknowledged blood link that provides a fundamental relationship between the parties. Reception in the home reinforces the open acknowledgment and the blood relationship.
(1) There was indeed a strong bond of affection between Wilts and Betty Barnes. Wilts generously provided financial aid and material assistance, and offered to assume the full duty of support. He provided discipline, advice and guidance. But Betty resided with her mother at all times before age 15 except when living in an orphanage. Neither Wilts nor Betty had reasonable expectations of adoption or a change in their legal relationship. (See Estate of Radovich (1957) 48 Cal.2d 116, 119 [308 P.2d 14], where the transferee held "the equitable status of an adopted *605 son.") At all relevant times, Mrs. Rockwell retained exclusive parental custody and control. Wilts could only act in the many important areas that show a parental status with the consent and permission of Mrs. Rockwell. The required assumption of parental status was not satisfied.
In many ways Wilts performed more of the "fatherly acts" than many natural fathers. Frequently good friends are closer than a natural brother or relative by blood. Still such friends are deemed Class C transferees. (Rev. & Tax. Code, § 13309.) The legislative policy under the inheritance tax laws is to treat closely related persons more favorably than the unrelated. Section 13307, subdivision (b) extends the favorable treatment to those who have assumed the parental status and the commensurate parental duties. True, Wilts and Betty had a close, friendly relationship independent of Mrs. Rockwell's custody. But that falls short of the requirements of section 13307, subdivision (b). A more expansive application of the tax statute as urged by respondent would distort the meaning of section 13307.
Judgment reversed.
Racanelli, P.J., and Elkington, J., concurred.
A petition for a rehearing was denied May 22, 1978, and respondent's petition for a hearing by the Supreme Court was denied June 29, 1978. Bird, C.J., was of the opinion that the petition should be granted.
NOTES
[*] Assigned by the Chairperson of the Judicial Council.