IN RE ESTATE OF EDWIN LEROY QUINN, DECEASED. SAMUEL MCPEEK, APPELLEE, V. SCOTTS BLUFF COUNTY, NEBRASKA, APPELLANT.

510 N.W.2d 488

Filed July 20, 1993.   No. A-92-405.

Sara Olsen, Deputy Scotts Bluff County Attorney, for appellant.

Michael J. Franciosi, of Atkins Ferguson Zimmerman Carney, P.C., for appellee.

SIEVERS, Chief Judge, and HANNON and IRWIN, Judges.

IRWIN, Judge.

## INTRODUCTION

Decedent, Edwin LeRoy Quinn, died testate on July 24, 1990. Quinn's first wife, Marjorie Lucille, predeceased him. They had no biological children. Quinn executed a will leaving the residue of his estate to appellee, Samuel McPeek. McPeek requested a refund of the tax assessed on his inheritance, according to Neb. Rev. Stat. § 77-2006 (Reissue 1990), which he paid as the result of a tentative tax determination in the estate of Quinn. McPeek requested the refund, asserting that he is "a person to whom the deceased, for ten years prior to death, stood in the acknowledged relationship of a parent," brief for appellee at 18, and that, therefore, he is entitled to the $10,000 exemption and 1-percent inheritance tax according to Neb. Rev. Stat. § 77-2004 (Reissue 1990). A judgment was obtained in the county court for Scotts Bluff County, ruling that McPeek was not entitled to the exemption and lower tax rate and denying his request for a refund of inheritance tax paid. McPeek appealed the ruling to the district court for Scotts Bluff County. The district court reversed the county court's judgment and held that the county court erred in finding that McPeek was not a person to whom the deceased stood in the acknowledged relationship of a parent and erred in denying him a refund of a

portion of the inheritance tax paid. Scotts Bluff County has appealed the district court's ruling. For the reasons discussed below, we affirm the decision of the district court.

## ASSIGNED ERROR

Scotts Bluff County assigns one error. That error is that the district court was incorrect in "finding that the evidence established that Sam McPeek is a person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent."

## STANDARD OF REVIEW

The appropriate standard of review in an appeal of an inheritance tax determination is a review for plain error appearing on the record. *In re Estate of Detlefs*, 227 Neb. 531, 418 N.W.2d 571 (1988). See, also, *In re Estate of Massie*, 218 Neb. 103, 353 N.W.2d 735 (1984), *disapproved on other grounds, In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986).

## FACTUAL BACKGROUND

While § 77-2004 applies to "any person to whom the deceased for not less than *ten years* prior to death stood in the acknowledged relation of a parent" (emphasis supplied), we must travel farther back in time than 10 years from Quinn's death to fully evaluate the relationship between McPeek and Quinn. The underlying facts are undisputed. McPeek was born in Scottsbluff, Nebraska, on June 3, 1956. His parents are Charles and Semalena McPeek. He also had an older sister and a younger brother.

When he was a young child, McPeek's parents operated the Gering Hotel cafe. The Quinns patronized the cafe often. A relationship was struck between the McPeek family and the Quinns. Beginning when he was approximately 3 years old, the Quinns would often take young McPeek and his sister home with them until the McPeek parents had closed the restaurant for the evening. When McPeek was approximately 4 years old, his family moved to Minatare, Nebraska. Semalena McPeek began attending college, and Charles McPeek ran the Chef Cafe in Minatare. McPeek remembers problems beginning to

surface between his parents during this timeframe. His father was "working all the time," and his mother was "going away to school." As the McPeek family unit began to fracture, young McPeek's relationship with the Quinns began to intensify. According to McPeek, he "grew up at Quinns." He spent a great deal of time with the Quinns due to the long hours his parents were away from the home. According to trial testimony, the Quinns became McPeek's surrogate family and instilled in him a work ethic and other individual values.

In 1961, the McPeeks moved to Casper, Wyoming. Although he attended grade school in Casper, young McPeek returned by train to Gering every weekend to reside with the Quinns. This continued throughout the first and second grades. The Quinns paid the train fare.

McPeek lived with the Quinns during his third grade year and attended school at McKinley school in Gering. Simultaneously, the marital relationship between McPeek's parents was disintegrating. His mother was away from the family home most of the time, including weekends, and his father was working much of the time. As McPeek advanced to the fourth grade, the Quinns voiced a desire that Semalena and Charles McPeek allow them to adopt young McPeek, but his parents would not agree. At the same time, Semalena McPeek became pregnant, and McPeek's parents returned him to Casper. Helping his mother with the newborn, McPeek remained in Casper until the summer between his fifth and sixth grade years. However, during that time he maintained his relationship with the Quinns, spending his holidays and weekends with them. The Quinns paid the travel expenses.

Between McPeek's fifth and sixth grade years, the McPeek family moved to Terrytown, Nebraska, a town near Gering. Semalena McPeek was teaching and stayed in Alliance, Nebraska. Charles McPeek was working "six to seven" days a week at the Scotts Bluff Country Club.

The Quinns resided a few blocks from the school that McPeek attended during the sixth grade. McPeek would stay at the Quinns' a great part of the time while school was in session, including weekends. He also spent holidays and summers with the Quinns.

McPeek's relationship with his biological parents was collapsing during his seventh, eighth, and ninth grade years. His father left the family and moved to Wisconsin. His mother was having alcohol problems. McPeek lived with the Quinns throughout much of this turmoil. He also spent most of his time with them during weekends, holidays, and summers. During his ninth grade year, the Quinns explored the possibility of establishing a guardianship, since McPeek felt it was impossible to remain with his mother, and his father was now living in another state. McPeek did not get along with his mother, and their relationship was severed after Semalena McPeek physically assaulted the Quinns during a conversation related to the guardianship and where McPeek would live. The guardianship was never accomplished. McPeek finished his ninth grade year in Gering, living with his older sister during the week and at the Quinns' on the weekends.

After completing the ninth grade, McPeek visited his father who was then living in Illinois. McPeek spent a month with him and then returned to the Quinns' for the remainder of the summer.

The Quinns and McPeek determined that he would continue his secondary schooling at a church boarding school in Seward, Nebraska. The Quinns and McPeek's father shared this expense. Charles McPeek paid tuition and board, and the Quinns covered the remaining living expenses, including medical, clothing, day-to-day items, and travel. Trial testimony revealed that without the Quinns' support, McPeek would have been unable to attend this school.

While attending boarding school, McPeek spent the holidays and vacation times with the Quinns. He no longer had any direct contact with his mother and saw his father once or twice a year.

McPeek's junior and senior high school years were spent at St. Paul's College High School in Concordia, Missouri. The financial responsibilities were again split between the Quinns and McPeek's father, and McPeek's free time was spent with the Quinns. During his junior year, the Quinns provided transportation for McPeek by purchasing him a car, titled in the names of Edwin Quinn or Sam McPeek.

After graduating from high school, McPeek attended a junior college. McPeek's father continued to pay tuition and board, and the Quinns paid the remainder of McPeek's expenses. Finishing junior college a semester early, McPeek came home to the Quinns and lived with them for the summer of 1975 and into the first portion of 1976. He attended school for one quarter in St. Paul, Minnesota, before moving to Ann Arbor, Michigan, and graduating from Concordia College in 1978. During college, McPeek continued to return home to the Quinns for holidays and summer vacations.

After college, McPeek attended Concordia Seminary in St. Louis, Missouri, with the Quinns and Charles McPeek sharing financial responsibilities in the same fashion as they had during his high school and college years. The only exception regarding financial responsibilities occurred during McPeek's third year in the seminary when he obtained an internship that satisfied his tuition requirement and relieved his father of this responsibility.

When McPeek graduated in May 1982 from Concordia Seminary, Edwin Quinn attended the graduation. In July 1982, McPeek was ordained in Kansas. Quinn was present at the ordination ceremony also. The Bonner Springs Chieftain, a local newspaper, carried the announcement of McPeek's ordination. It read: "Samuel McPeek of Gering, Neb., has received and accepted a call to become pastor of Emmaus Lutheran Church . . . . The son of Mr. and Mrs. Edwin Quinn of Gering, Neb., and Charles McPeek of Kearney, Neb. . . . ."

After McPeek's ordination, he continued to call home to Quinn every Saturday morning, and Quinn would travel to Kansas to spend the holidays with McPeek. After Quinn's health deteriorated and he could no longer travel to Kansas, McPeek would travel to Gering to visit him.

When they were in public together, McPeek referred to the Quinns as "Mom" and "Dad," and the Quinns referred to McPeek as their son.

"Mom Quinn," as McPeek referred to her, died in 1982. Both she and her husband had experienced health problems over the years. In 1976, Marjorie Lucille Quinn, known as Lucille Quinn, had been diagnosed with cancer. "Dad," as

McPeek called Edwin Quinn, telephoned him in 1976 to tell him about Lucille Quinn's upcoming surgery. Edwin Quinn bought McPeek an airline ticket to travel to Nebraska for Lucille Quinn's surgery. In November 1980, Edwin Quinn had an emergency operation. McPeek chartered a plane to be present. He was also at Lucille Quinn's bedside in March 1981 when she underwent another major surgery related to cancer. Ultimately, she died in March 1982. McPeek attended her funeral. Her obituary appearing in the newspaper read "[s]urvivors include her husband; son, Sam McPeek . . . ."

After Lucille Quinn's death, McPeek called Edwin Quinn every Saturday morning. Quinn visited McPeek on holidays and several other times until Quinn's health deteriorated to an extent that he could no longer drive. Quinn eventually died July 24, 1990.

## ANALYSIS

Whether a decedent stood in the acknowledged relationship of a parent pursuant to § 77-2004 requires resolution of factual issues by the trial court. See *Estate of Larson*, 106 Cal. App. 3d 560, 166 Cal. Rptr. 868 (1980). The trial court should consider all pertinent factors in arriving at that factual conclusion. The trial court's findings concerning factual determinations should be reviewed, keeping in mind that the scope of review in such determinations is whether the finding is supported by sufficient evidence and should not be disturbed unless clearly wrong. See *In re Estate of Massie*, 218 Neb. 103, 353 N.W.2d 735 (1984). The district court, which sat as an appellate court in this case, and the Court of Appeals shall review the case for plain error appearing on the record. See *In re Estate of Detlefs*, 227 Neb. 531, 418 N.W.2d 571 (1988).

Section 77-2004 requires that

[i]n the case of . . . any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent . . . the rate of tax shall be one percent of the clear market value of the property in excess of ten thousand dollars received by each person.

The above statute contemplates that persons standing in loco parentis for 10 years prior to death are within the intent and

scope of the provision. *In re Estate of Dowell*, 149 Neb. 599, 31 N.W.2d 745 (1948). Specific criteria to determine whether a person stands in loco parentis to a person within the context of § 77-2004 have never been delineated in a Nebraska case. The California case of *Estate of Larson* has dealt with statutory language similar to § 77-2004. That court interpreted the statutory phrase "acknowledged relationship of a parent" to connote a status of in loco parentis, which refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formalities necessary to legal adoption. *Estate of Larson, supra.* It should be noted that this definition is almost identical to Nebraska case law on the subject of in loco parentis. See, *Cornhusker Christian Ch. Home v. Dept. of Soc. Servs.*, 227 Neb. 94, 416 N.W.2d 551 (1987), *appeal dismissed* 488 U.S. 919, 109 S. Ct. 298, 102 L. Ed. 2d 317 (1988); *Austin v. Austin*, 147 Neb. 109, 22 N.W.2d 560 (1946). The *Estate of Larson* court goes on to state that comparison of the statutory phrase "acknowledged relationship of a parent" to the concept of in loco parentis might suggest to some that the relationship must be precisely the same as a biological parent and child. That court held that the phrase "is not so narrow in its meaning." *Estate of Larson*, 106 Cal. App. 3d at 563, 166 Cal. Rptr. at 870. Citing *Estate of Wilts*, 80 Cal. App. 3d 599, 145 Cal. Rptr. 759 (1978), the *Estate of Larson* court said, "The law recognizes that although a natural parent-child relationship may exist elsewhere, if the parties regard each other in all of the usual incidents and relationships of family life as parent and child, the benefits" of the inheritance tax statute flow. *Estate of Larson*, 106 Cal. App. 3d at 563, 166 Cal. Rptr. at 870. The *Estate of Larson* court also reviewed some factors to determine if a person is to be acknowledged as a parent in a situation such as that before us. Those factors are as follows: reception of the child into the home and treatment of the child as a member of the family, assumption of the responsibility for support beyond occasional gifts and financial aid, exercise of parental authority in discipline, relationship by blood or marriage, advice and guidance to the child, and sharing of time and affection. It

should be noted that the *Estate of Larson* court also addressed the question of whether total or exclusive financial support is required. Citing the Nebraska case of *In re Estate of Dowell*, and cases from several other jurisdictions, the court held that a person may stand in loco parentis despite other sources of support for the child.

In *Austin*, the Nebraska Supreme Court held that the assumption of the relationship of in loco parentis to a child is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in such relationship. While that particular case did not deal with § 77-2004, it is useful, since it dealt with the concept of in loco parentis in the context of a case involving inheritance issues.

One more factor needs discussion before we determine whether Edwin Quinn stood in the acknowledged relationship of a parent.

As disclosed in *In re Estate of Dowell*, this portion of § 77-2004 and other related provisions have been adopted from a similar statute of New York. According to *In re Estate of Dowell*, in determining the construction of these Nebraska statutes, we look to the construction placed upon their counterparts by the courts of New York, in the absence of a contrary intention being expressed by our Legislature. With this principle in mind, we look at *Matter of Beach*, 154 N.Y. 242, 48 N.E. 516 (1897). The court in that case found that the phrase "any person" in § 77-2004 includes both minors and adults. The fact that a parent-child relationship may start when both parties are adults, or may begin when the child is a minor and continue after that child reaches adulthood, is not a bar to a claim made under the relevant language of § 77-2004. This point of law is valuable because it allows some latitude in determining when this parent-child relationship existed. Our determination is not restricted, therefore, to an examination of only childhood years, but also adult years of the child.

Given the various criteria discussed above, and mindful of the scope of review, we hold that the district court was correct in finding that Edwin Quinn stood in the acknowledged relationship of a parent to McPeek. On the date of Quinn's death, McPeek was 34 years old. During McPeek's ninth grade

of school, which was obviously during his adolescence, he severed all relations with his mother, and his father had left the family although he did contribute to McPeek's support. Prior to this time period, as well as after it, Quinn and his wife welcomed young McPeek into their home. He lived full time with them when he was in the third grade and continued throughout his early years to know the Quinn residence as home, spending weekends, holidays, and vacations with the Quinns. To be a member of a household, it is not necessary that a person reside in a house every day of every week. In *Wondra v. Platte Valley State Bank & Trust Co.*, 194 Neb. 41, 230 N.W.2d 182 (1975), the Nebraska Supreme Court held that the fact that a minor stepdaughter of a testatrix was physically absent from the home of the testatrix while attending school, during a part of which time the stepdaughter lived with her maternal relatives in another state and was physically present in the testatrix's home only during vacation time, did not prevent the stepdaughter from being a member of the testatrix's household and having her permanent home in the home of the testatrix. From 1957 until 1987, § 77-2004 remained virtually unchanged. It stated that

> any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent . . . ; *Provided, that no one shall be considered a person to whom the deceased stood in the acknowledged relation of a parent unless he or she shall have been a member of the household of the deceased and shall have had his or her permanent home in the home of the deceased for at least five continuous years during his or her minority.*

(Second emphasis supplied.) § 77-2004 (Reissue 1986).

Section 77-2004 (Reissue 1990) no longer contains a residency requirement. After completing the ninth grade, McPeek had no relationship with his mother and never lived with his father again. The only home he knew was the Quinns'. The Quinns were the only parents he knew.

The parties themselves referred to their relationship as one of father-son and mother-son. When the Quinns were out in public, McPeek was their son. When Lucille Quinn died, Edwin

Quinn supplied the information to the newspaper for her obituary. It listed McPeek as her son. When McPeek was ordained and an announcement appeared in the newspaper, he listed the Quinns as his parents. The financial aid and assistance the Quinns gave was much more than occasional or sporadic. Without their assistance, McPeek would have been unable to attend secondary and postsecondary schools. It was the Quinns, McPeek testified, who taught him his work ethic and values. It was the Quinns who were there to counsel, advise, and share their time and affection with McPeek. This relationship goes back farther than 10 years prior to Edwin Quinn's death. While no exact date can be affixed as to when Edwin Quinn began to occupy the position of father to McPeek, it is certain that it was more than 10 years prior to the death of the decedent. The assumption of the relationship of parent is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in that position. *Austin v. Austin*, 147 Neb. 109, 22 N.W.2d 560 (1946).

A review of the county court's memorandum opinion shows it to focus somewhat narrowly on the factor of where McPeek resided throughout his early years and later. The memorandum opinion states in relevant part:

> In this case the decedent did not stand in the relationship of parent to Sam McPeek except for one school year when the petitioner resided with the Quinns. The petitioner otherwise resided with one, or both, of his parents or attended boarding school. He received financial support from his parents including college tuition.

While a child's residence is necessarily a factor to be considered in deciding whether a parent-child relationship exists, it is not the only one. As stated above, § 77-2004 has in the past *required* residency. However, that condition no longer exists. All that is required is that the person claiming the exemption stood in an acknowledged parent-child relationship with the deceased.

In conclusion, we hold that the district court correctly determined that the county court erred when it found McPeek was not a person to whom the deceased for not less than 10

years prior to death stood in the acknowledged relationship of a parent. The district court's order is affirmed.

AFFIRMED.